575 P.2d 1236

**STATE of Arizona, Appellee,**

v.

**Henry Gonzales SIMS, Jr., Appellant.**

**No. 3959.**

Supreme Court of Arizona,
En Banc.

Jan. 18, 1978.

Rehearing Denied March 14, 1978.

Bruce E. Babbitt, Atty. Gen. by William J. Schafer, III and R. Wayne Ford, Asst. Attys. Gen., Phoenix, for appellee.

John M. Neis, Pima County Public Defender by James E. Sherman, Asst. Public Defender, Tucson, for appellant.

HAYS, Justice.

Appellant Henry Gonzales Sims, Jr., pled guilty on February 18, 1976 to a charge of voluntary manslaughter with a gun, pursuant to a plea agreement which had been filed with the Pima County Superior Court. Thereafter, on April 19, 1977 he was sentenced to imprisonment for a term of not less than thirty years nor more than life. We have jurisdiction of his appeal pursuant to A.R.S. § 13–1711 and § 12–120.21(A)(1).

Appellant was originally indicted on October 22, 1975 by the Pima County Grand Jury for one count of first degree murder and one count of assault with a deadly weapon, which offenses were alleged to have been committed on October 18, 1975. The record on appeal includes the grand jury transcript, a typed transcription of statements made by appellant to a Tucson Police Department detective on the date of the offense, and several statements made by appellant during the course of the Superior Court proceedings as to the events of that day; thus, it is possible to summarize the incidents which led to these criminal proceedings, as follows.

Appellant and the homicide victim, Mary Virginia Munguia, lived in separate adjoining apartments at a South Liberty address in Tucson. There is no evidence of any significant prior relationship or acquaintance between the two. On the morning in question, an argument ensued between the appellant and the victim's mother, Anita Garcia, concerning the appellant's automobile. The brief argument occurred in the area in front of the two adjoining apartments and was witnessed by several neighbors. Appellant accused Anita Garcia and her daughter and friends of "messing with" his car, to the extent that it would not start that morning. Anita Garcia denied this and went into her daughter's apartment. Appellant then apparently entered his apartment, secured a loaded .357 magnum pistol from within, tucked it into his belt, and returned to the front yard area where he resumed work on his automobile. Shortly thereafter, Mary Munguia exited her apartment to retrieve one of her small children from the front yard. Appellant likewise accused Mary of tampering with his automobile, which she vehemently denied; he then fired two pistol shots at her, and she fell in the front yard. Anita Garcia's ex-husband, Jose L. Garcia, had been within the Munguia apartment during these events. After the shots were fired, he ran from the residence in an attempt to call police and ambulance services; appellant fired at least two shots at Jose Garcia as Garcia was fleeing, but did not wound him. A subsequent autopsy of Mary Munguia revealed that she was five and one-half months pregnant, and that the cause of her death was severe hemorrhaging from a single gunshot wound. A .357 magnum bullet was found in her blouse; the path of that bullet was traced through the top part of her chest and off the inside of her right arm. Ballistics tests later showed that the bullet was fired from a pistol taken from appellant at the time of his arrest. After the arrest, appellant was appropriately informed of the so-called "*Miranda* warnings" and gave a full statement to officers of the Tucson Police Department. Appellant indi-

cated that he shot the victim because he was "mad"; that "these people have been messing with me all kinds of ways, they been getting these guys to mess with my car and they been taking my mail, and everything. They been going under my name, and all . . . and all that"; that he did not think "this was self-defense" because "Well, I wasn't afraid of her"; that he knew "right from wrong" and that it was wrong that he shot the victim; but that "I was mad . . . because I'm fed up with what these people being [sic] doing to me all the time . . ."

During the period from October, 1975 until May, 1977, while this case was pending in Superior Court, the appellant underwent a series of eight separate mental examinations, and the court conducted four evidentiary hearings dealing with his competence to stand trial, to enter a plea of guilty, and to be sentenced. On December 3, 1975 appellant's appointed counsel filed a "Motion for Mental Condition Examination and Stay of Proceedings" pursuant to 17 A.R.S. Rules of Criminal Procedure, rule 11. The motion was granted on December 15, 1975, and the court appointed two practicing psychiatrists, Jacob D. Hoogerbeets, M.D. and Allan Beigel, M.D., for the examinations. Dr. Hoogerbeets' examination of appellant was conducted on December 29, 1975, and in his written report to the court Dr. Hoogerbeets concluded that appellant was a chronic paranoid schizophrenic, but that he was "able to understand the nature and quality of the charges and proceedings against him, and he is able to assist counsel in the preparation of his own defense in a basic and factual manner" and that "although in a basic sense he knew the nature and quality of his actions and knew the difference between right and wrong, it is important to remember that this man has been chronically psychotic for a long period of time." Dr. Beigel's examination was given on January 19, 1976, and his written report to the court states also that appellant is a chronic paranoid schizophrenic, but that ". . . he is still able to assist counsel in the preparation of his defense and to understand the nature of the charges against him" and that "this

mental illness did not impair his capacity to differentiate between right and wrong at the time of the alleged offense, but did impair his judgment regarding his actions."

On February 18, 1976 the court conducted an evidentiary hearing "to determine the defendant's competency." Rule 11.5, *supra.* Counsel for both appellant and the State stipulated that the testimony of the two psychiatrists could be submitted on the basis of the written reports referred to above. In addition to these two reports, the court also considered the transcription of the statement appellant had given to Tucson police officers shortly after his arrest on the date of the offenses; the court then questioned appellant extensively, in view of the fact that he had chosen to enter a plea of guilty at that time. Appellant was questioned about his name, education, past occupations, and military service; about the plea agreement which had been filed with the court and his understanding of it; about the nature of the charge (voluntary manslaughter with a gun) to which he was to plead guilty; about the possible range of punishment for that charge, and the court's options as to probation or a prison term for appellant; about the various Constitutional rights he was giving up by pleading guilty; and finally, about the events on the day of the crimes and his statement to the police. During the course of the hearing, the court specifically found: 1) "that defendant is able to stand trial, that he is able to assist counsel in the preparation of his defense"; 2) "that the defendant did know the nature and quality of his acts and the difference between right and wrong at the time of the commission of the offense in question"; 3) "that a factual basis exists for the plea of guilty to the charge of voluntary manslaughter"; 4) "that the defendant understands, appreciates, and has knowingly, intelligently waived the constitutional rights which have been explained to him and outlined to him by the Court"; and 5) "that the defendant has intelligently and voluntarily with a full knowledge of the consequences thereof and with the advice of counsel has [sic] entered a plea of guilty to

the charge of voluntary manslaughter". Appellant's appointed counsel further informed the court that based on his investigation, the appellant definitely "does have a mental illness, however, as far as the McNaughton [sic] test and as far as the competency to enter this plea there is no question that he is both competent to enter the plea and he is not McNaughton [sic] insane." At the conclusion of the plea proceedings, the case was continued so that a presentence investigation of appellant could be performed.

During the course of the presentence investigation, appellant was examined on March 9, 1976 by Kevin Gilmartin, Ph.D., a practicing clinical psychologist. In his written report to the court, Dr. Gilmartin stated that the appellant "relates a rather involved delusional system relating to how there is basically a conspiracy against him of men and women who are attempting to manipulate him and use his name against him" and that appellant was suffering from "chronic paranoid schizophrenia" and was "in need of intensive and long term psychiatric treatment at this point in time." Dr. Gilmartin's report did not refer specifically to the M'Naghten standard, nor to appellant's ability to stand trial, to enter a plea, nor to be sentenced. Apparently on the basis of this report by Dr. Gilmartin, appellant's attorney requested another "Rule 11 hearing". By minute entry dated March 19, 1976 the court deferred sentencing and scheduled the requested hearing, appointing Drs. Beigel and Hoogerbeets to re-examine appellant.

Dr. Hoogerbeets examined appellant on April 26, 1976 and made another written report of his findings to the court. He stated that "my conclusions in this case are essentially the same as those which I expressed in my previous report" but that appellant was "a little more deteriorated than he was when I saw him previously" and "more overtly psychotic" and that "he is not able to fully weigh the consequences of pleas or actions with his counsel. I feel that he is not fully competent to be involved in a plea bargaining process at this time." Likewise, Dr. Beigel examined ap-

pellant on April 28, 1976 and his written report states that "his mental condition has deteriorated to a slight extent since the time of my original examination" and that "there has been some worsening of his mental illness which does impair his capacity to understand the plea bargaining into which he is entering and its consequences".

On June 1 and 2, 1976 the court conducted a second "Rule 11 hearing" and heard evidence from Drs. Hoogerbeets and Beigel and from appellant. The court and counsel attempted to elicit an opinion from the doctors as to what the appellant's condition had been on the date the guilty plea was entered. Dr. Beigel testified that "I can only have an opinion by inference of what his condition was at the time that he entered the plea bargaining" and the date of the plea "more closely approximates the date of my first examination" than the second; that "[t]here is . . . some evidence of deterioration between—mental states between the two examinations"; and "I cannot make any direct judgment whatsoever as to what he understood on the 18th. It's only an inference". As to his second examination, Dr. Hoogerbeets testified that appellant was "a little more deteriorated" than previously; that "I didn't find him competent to enter into a plea bargain"; that as of the date of the guilty plea "I had my doubts about it, too . . ." and "I have my doubts whether he would be fully competent" but that "[t]his would be an [sic] inferential—"; and that appellant had not been M'Naghten insane at the time of the offense. The court also heard testimony from appellant, who stated that he did remember the incidents surrounding the crime and his previous guilty plea, and understood that voluntary manslaughter is a less serious crime than first degree murder. At the conclusion of the proceedings, the court took the matter under advisement.

On October 14, 1976 further evidence was heard in this same "Rule 11 hearing". Dr. Beigel testified briefly that the appellant could in the future, with proper care and treatment, regain competency "to under-

stand the proceedings against him". Similarly, Dr. Hoogerbeets stated that at the end of some period of treatment "he could show changes . . . for the better". At the conclusion of the proceedings, the court found appellant incompetent to be sentenced at that time but overruled a defense motion to set aside the prior guilty plea. Pursuant to 17 A.R.S. Rules of Criminal Procedure, rule 11.5(b)(3), the court then ordered appellant committed to the Arizona State Hospital "for treatment for a period not exceeding 6 months".

During his commitment at the state hospital, appellant was examined on February 23, 1977 by Bela J. Matty, M.D., a staff psychiatrist. In a written report to the court, Dr. Matty concluded that appellant's abilities were "unimpaired" to the extent that he should be "returned to court for further process under the law". (Dr. Matty noted also that appellant was "probably delusional at the time of the offense" and "the alleged offense seems to be in direct relation to his delusional illness".) By minute entry dated March 1, 1977 the court ordered appellant returned to the Pima County Jail, and on March 9, 1977 entered its "Order for Examination", appointing Drs. Beigel and Hoogerbeets for the purpose of determining "defendant's competency to be sentenced".

Both doctors examined appellant on March 10, 1977. Dr. Beigel's written report states that appellant's "mental status is clearly improved over what was noted during the April 1976 examination" and "in summary" appellant is "currently reconstituted" from his prior condition and "able to understand the procedures which he now must face in court". Dr. Hoogerbeets' written report reflects that appellant "would be able to stand sentencing at this time".

On April 4 and 8, 1977 the court heard testimony from Drs. Beigel and Hoogerbeets and from appellant, on the question of appellant's competency to be sentenced. Dr. Hoogerbeets testified that appellant was still a chronic paranoid schizophrenic but "I found some definite improvement";

that appellant was competent to be sentenced "at this time"; and that "today" appellant is competent to "make a plea and be sentenced". Dr. Beigel stated that appellant "is, at this time, able to understand the procedures which he must now face in Court" and assist counsel for the "purposes of sentencing". Appellant testified that he understood that the "next stage" is sentencing and the possibility of prison, and described prison as "just a jail where they keep people that do wrong". At the conclusion of the proceeding, the court found the appellant competent to be sentenced and refused "to reconsider or change my previous ruling as to his competency at the time he changed his plea". A sentencing date was then set.

On April 13, 1977 defendant's counsel filed a "Renewal of Motion to Withdraw Guilty Plea; Request of Court to Inquire of Defendant his Understanding of Court Proceedings" and a "Motion for Rule 11 Hearing to Determine Competency". Both motions were argued on April 19, 1977 and denied by the court. On that date, the court granted allocution and sentenced appellant to incarceration in the state prison for a term of not less than 30 years nor more than life. Thereafter, appellant's counsel stated that he had received a copy of the report from Dr. Matty only one week prior to sentencing, and that in his (counsel's) opinion the report disclosed that appellant might have had a M'Naghten defense to the charges; on that basis counsel moved for leave to withdraw the guilty plea. The motion was denied. Appeal was taken from the judgment and sentence of the court.

On April 27, 1977 appellant filed a "Motion to Vacate Judgment", alleging as grounds therefor that first, appellant was incompetent at the time he pled guilty and second, "the defendant now is in possession of newly discovered evidence of material facts under the standards of Rule 32.1 of the Arizona Rules of Criminal Procedure". In support of this second ground, appellant maintained that he had an insanity defense to the charge; attached to the Motion was

a letter dated April 25, 1977 from Dr. Matty to appellant's counsel, containing the following: "As noted in the report of 2/23/77, even though he was considered competent to stand trial, there was very little information available about the circumstances leading to, and his mental condition at the time of the alleged offense. The assumptions . . . were that he probably was delusional and could not distinguish between right and wrong as defined in the M'Naghten Rule. It was a speculative conclusion derived from clinical contact after his admission on 10/16/76, and past history indicated a gradual psychotic process developing over the past 13 years to an overt delusional illness." No evidence was presented by either side on this motion, but arguments were heard by the court on May 9, 1977 and it was taken under advisement; the motion was denied on May 11, 1977 and appellant appealed from the denial. At appellant's request, the Court of Appeals consolidated these two appeals and transferred them here.

Appellant raises three issues in these consolidated appeals: First, that "the defendant was incompetent to enter a plea of guilty on February 18, 1976"; second, "assuming arguendo that this court does not find sufficient evidence in the record to justify a finding that the defendant was incompetent to enter a plea of guilty the matter must be returned to the trial court for a determination of competency under the proper standard"; and third, "the trial court abused its discretion by denying the defendant's motion to vacate the judgment and sentence". We find no merit in any of these contentions and affirm the judgment and sentence of the Superior Court.

With regard to appellant's first two contentions, we start with the proposition that a defendant's competency to enter a plea of guilty to a criminal charge is a factual question, which must be decided on a case-by-case basis by the court. 17 A.R.S. Rules of Criminal Procedure, rule 11. Thus, the role of an appellate court is merely to determine whether the trial court's finding is supported by reasonable evidence; *i. e.*, whether its finding was clearly erroneous.

*State v. Ferguson,* 26 Ariz.App. 285, 547 P.2d 1085 (1976). The standard by which the trial judge must measure competence to enter a guilty plea has been set forth in *Sieling v. Eyman,* 478 F.2d 211 (9th Cir. 1973) as follows:

"A defendant is not competent to plead guilty if a mental illness has substantially impaired his ability to make a reasoned choice among the alternatives presented to him and to understand the nature of the consequences of his plea." 478 F.2d at 215.

This court has likewise recognized that the standard of competency to plead guilty is higher than the standard of competency to stand trial, and held in *State v. Contreras,* 112 Ariz. 358, 542 P.2d 17 (1975), that a finding by the trial court that a plea was "voluntary and knowing" was sufficient. 542 P.2d at 19. With regard to the February 18, 1976 hearing, it is clear that the trial court considered, *inter alia,* two written psychiatric reports on appellant's condition, a transcription of the statement given by appellant shortly after his arrest, and the appearance and statements of appellant himself (which, the court noted, corresponded closely to his prior statement to Tucson police officers), elicited during a lengthy and exhaustive examination by the court. We note additionally that there was no evidence presented that appellant was not fully competent. Appellant's attorney conceded, in fact, that his client was fully competent to enter the plea. *See State v. Rodriguez,* 112 Ariz. 193, 540 P.2d 665 (1975), and *State v. Pierce,* 116 Ariz. 435, 569 P.2d 865 (App.1977). Further, appellant appears to have made a "good deal" with regard to his plea agreement, and was not making an unreasonable choice, as an incompetent defendant might. *See Makal v. State of Arizona,* 544 F.2d 1030 (9th Cir. 1976), where the court said:

"Under those circumstances, the alternative selected by [defendant] was not unintelligent or unreasoned within the rule of competency. See *North Carolina v. Alford,* 400 U.S. 25, 31, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). It appears to have

been distinctly to his advantage." 544 F.2d at 1035.

With regard to appellant's competence to enter the plea of guilty, the trial court specifically found "that the defendant understands, appreciates, and has knowingly, intelligently waived the constitutional rights which have been explained to him and outlined to him by the Court" and "that the defendant has intelligently and voluntarily with a full knowledge of the consequences thereof and with the advice of counsel has [sic] entered a plea of guilty to the charge of voluntary manslaughter". We find that the trial court did in fact apply the correct standard to the question of appellant's competency to enter a plea of guilty within the dictates of *Sieling, supra,* and *Contreras, supra.* We further find that the trial court's determination that this standard was met in the instant case is supported by reasonable evidence and is not clearly erroneous. *State v. Ferguson, supra; State v. Young,* 112 Ariz. 361, 542 P.2d 20 (1975).

Appellant's final point is that the trial court abused its discretion by failing to vacate the judgment and sentence in the face of "newly discovered evidence"; *i. e.,* the possibility of a M'Naghten defense to the charge, based on Dr. Matty's letter dated April 25, 1977. Appellant relies on 17 A.R.S. Rules of Criminal Procedure, rules 24.2(a)(2) and 32.1 (to which specific reference is made in rule 24.2(a)(2)). Rule 24.2 is entitled "Motion to vacate judgment" and rule 32.1, "Scope of remedy"; rule 32.1(e) refers to "newly-discovered material facts". We feel that appellant's reliance thereon is misplaced, in that rule 24 applies to "Post-*Trial* Motions" only. We will proceed to review appellant's complaint under the more appropriate rule, 17 A.R.S. Rules of Criminal Procedure, rule 17.5, "Withdrawal of plea".

Rule 17.5 states, in part:

"The court, *in its discretion,* may allow withdrawal of a plea of guilty or no contest when necessary *to correct a manifest injustice.*" (Emphasis added.)

Thus, the granting of a motion to withdraw a guilty plea is within the sound discretion of the trial court, and in the absence of a clear abuse of that discretion, the trial court's ruling will not be disturbed on appeal. *State v. Cornwall,* 114 Ariz. 502, 562 P.2d 382 (App.1976); *State v. Ellison,* 111 Ariz. 167, 526 P.2d 706 (1974). Here, the trial court had before it a letter from Dr. Matty to defense counsel containing "assumptions" and a "speculative conclusion" that appellant might have been M'Naghten insane at the time of the offense. On the other hand, the court had considered numerous written psychiatric reports, heard testimony of several examining doctors, read appellant's statement given on the day of the crime, and heard appellant's own explanation of the crime and his state of mind at that time; all of these sources indicated no defense of insanity. We simply fail to see the "clear abuse of discretion" required by *Cornwall, supra,* and *Ellison, supra.* Finally, and significantly, we note that appellant's first notice of intention to assert a defense of insanity was given on April 19, 1977 (the date of sentencing), some 14 months after appellant had pled guilty on February 18, 1976. Appellant had thereby waived any possible insanity defense. In Arizona, a valid guilty plea waives all nonjurisdictional defenses, including the defense of not guilty by reason of insanity. *State v. Hostler,* 109 Ariz. 212, 507 P.2d 974 (1973); *State v. Johnson,* 116 Ariz. 561, 570 P.2d 503 (App.1977).

We have reviewed the record pursuant to A.R.S. § 13–1715 and find no fundamental error. The judgment of conviction and the sentence are affirmed.

CAMERON, ·C. J., STRUCKMEYER, V. C. J., and HOLOHAN and GORDON, JJ., concurring.