# GODINEZ, WARDEN *v.* MORAN

No. 92–725.  Argued April 21, 1993—Decided June 24, 1993

THOMAS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, O'CONNOR, and SOUTER, JJ., joined, and in Parts I, II–B, and III of which SCALIA and KENNEDY, JJ., joined. KENNEDY, J., filed an opinion concurring in part and concurring in the judgment, in which SCALIA, J., joined, *post*, p. 402. BLACKMUN, J., filed a dissenting opinion, in which STEVENS, J., joined, *post*, p. 409.

*David F. Sarnowski,* Chief Deputy Attorney General of Nevada, argued the cause for petitioner. With him on the brief were *Frankie Sue Del Papa,* Attorney General, and *Brooke A. Nielsen,* Assistant Attorney General.

*Amy L. Wax* argued the cause for the United States as *amicus curiae* urging reversal. With her on the brief were *Acting Solicitor General Bryson, Acting Assistant Attorney General Keeney,* and *Joel M. Gershowitz.*

*Cal J. Potter III,* by appointment of the Court, 506 U. S. 1046, argued the cause for respondent. With him on the brief was *Edward M. Chikofsky.**

JUSTICE THOMAS delivered the opinion of the Court.

This case presents the question whether the competency standard for pleading guilty or waiving the right to counsel is higher than the competency standard for standing trial. We hold that it is not.

I

On August 2, 1984, in the early hours of the morning, respondent entered the Red Pearl Saloon in Las Vegas, Nevada, and shot the bartender and a patron four times each with an automatic pistol. He then walked behind the bar and removed the cash register. Nine days later, respondent arrived at the apartment of his former wife and opened fire on her; five of his seven shots hit their target. Respondent then shot himself in the abdomen and attempted, without success, to slit his wrists. Of the four victims of respondent's gunshots, only respondent himself survived. On August 13, respondent summoned police to his hospital bed and confessed to the killings.

After respondent pleaded not guilty to three counts of first-degree murder, the trial court ordered that he be examined by a pair of psychiatrists, both of whom concluded that he was competent to stand trial.[1] The State thereafter an-

---

*Kent S. Scheidegger* and *Charles L. Hobson* filed a brief for the Criminal Justice Legal Foundation as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Steven R. Shapiro, Diann Y. Rust-Tierney, John A. Powell,* and *Bruce J. Winick;* for the American Psychiatric Association et al. by *James W. Ellis* and *Barbara E. Bergman;* and for the National Association of Criminal Defense Lawyers by *Jon May.*

[1] One of the psychiatrists stated that there was "not the slightest doubt" that respondent was "in full control of his faculties" insofar as he had the "ability to aid counsel, assist in his own defense, recall evidence and . . .

nounced its intention to seek the death penalty. On November 28, 1984, 2½ months after the psychiatric evaluations, respondent again appeared before the trial court. At this time respondent informed the court that he wished to discharge his attorneys and change his pleas to guilty. The reason for the request, according to respondent, was to prevent the presentation of mitigating evidence at his sentencing.

On the basis of the psychiatric reports, the trial court found that respondent

> "is competent in that he knew the nature and quality of his acts, had the capacity to determine right from wrong; that he understands the nature of the criminal charges against him and is able to assist in his defense of such charges, or against the pronouncement of the judgment thereafter; that he knows the consequences of entering a plea of guilty to the charges; and that he can intelligently and knowingly waive his constitutional right to assistance of an attorney." App. 21.

The court advised respondent that he had a right both to the assistance of counsel and to self-representation, warned him of the "dangers and disadvantages" of self-representation, *id.*, at 22, inquired into his understanding of the proceedings and his awareness of his rights, and asked why he had chosen to represent himself. It then accepted respondent's waiver of counsel. The court also accepted respondent's guilty pleas, but not before it had determined that respondent was not pleading guilty in response to threats or promises, that he understood the nature of the charges against him and the consequences of pleading guilty, that he was aware of the

---

give testimony if called upon to do so." App. 8. The other psychiatrist believed that respondent was "knowledgeable of the charges being made against him"; that he had the ability to "assist his attorney, in his own defense, if he so desire[d]"; and that he was "fully cognizant of the penalties if convicted." *Id.*, at 17.

rights he was giving up, and that there was a factual basis for the pleas. The trial court explicitly found that respondent was "knowingly and intelligently" waiving his right to the assistance of counsel, *ibid.*, and that his guilty pleas were "freely and voluntarily" given, *id.*, at 64.[2]

On January 21, 1985, a three-judge court sentenced respondent to death for each of the murders. The Supreme Court of Nevada affirmed respondent's sentences for the Red Pearl Saloon murders, but reversed his sentence for the murder of his ex-wife and remanded for imposition of a life sentence without the possibility of parole. *Moran* v. *State*, 103 Nev. 138, 734 P. 2d 712 (1987).

On July 30, 1987, respondent filed a petition for post-conviction relief in state court. Following an evidentiary hearing, the trial court rejected respondent's claim that he was "mentally incompetent to represent himself," concluding that "the record clearly shows that he was examined by two psychiatrists both of whom declared [him] competent." App. to Pet. for Cert. D–8. The Supreme Court of Nevada dismissed respondent's appeal, *Moran* v. *Warden*, 105 Nev. 1041, 810 P. 2d 335, and we denied certiorari, 493 U. S. 874 (1989).

Respondent then filed a habeas petition in the United States District Court for the District of Nevada. The District Court denied the petition, but the Ninth Circuit reversed. 972 F. 2d 263 (1992). The Court of Appeals concluded that the "record in this case" should have led the trial court to "entertai[n] a good faith doubt about [respondent's] competency to make a voluntary, knowing, and intelligent

---

[2] During the course of this lengthy exchange, the trial court asked respondent whether he was under the influence of drugs or alcohol, and respondent answered as follows: "Just what they give me in, you know, medications." *Id.*, at 33. The court made no further inquiry. The "medications" to which respondent referred had been prescribed to control his seizures, which were a byproduct of his cocaine use. See App. to Pet. for Cert. D–4.

waiver of constitutional rights," *id.*, at 265,[3] and that the Due Process Clause therefore "required the court to hold a hearing to evaluate and determine [respondent's] competency . . . before it accepted his decision to discharge counsel and change his pleas," *ibid.* Rejecting petitioner's argument that the trial court's error was "cured by the postconviction hearing," *ibid.*, and that the competency determination that followed the hearing was entitled to deference under 28 U. S. C. § 2254(d), the Court of Appeals held that "the state court's postconviction ruling was premised on the wrong legal standard of competency," 972 F. 2d, at 266. "Competency to waive constitutional rights," according to the Court of Appeals, "requires a higher level of mental functioning than that required to stand trial"; while a defendant is competent to stand trial if he has "a rational and factual understanding of the proceedings and is capable of assisting his counsel," a defendant is competent to waive counsel or plead guilty only if he has "the capacity for 'reasoned choice' among the alternatives available to him." *Ibid.* The Court of Appeals determined that the trial court had "erroneously applied the standard for evaluating competency to stand trial, instead of the correct 'reasoned choice' standard," *id.*, at 266–267, and further concluded that when examined "in light of the correct legal standard," the record did not support a finding that respondent was "mentally capable of the reasoned choice required for a valid waiver of constitutional rights," *id.*, at 267.[4] The Court of Appeals accordingly in-

---

[3] The specific features of the record upon which the Court of Appeals relied were respondent's suicide attempt; his desire to discharge his attorneys so as to prevent the presentation of mitigating evidence at sentencing; his "monosyllabic" responses to the trial court's questions; and the fact that he was on medication at the time he sought to waive his right to counsel and plead guilty. 972 F. 2d, at 265.

[4] In holding that respondent was not competent to waive his constitutional rights, the court placed heavy emphasis on the fact that respondent was on medication at the time he sought to discharge his attorneys and plead guilty. See *id.*, at 268.

structed the District Court to issue the writ of habeas corpus within 60 days, "unless the state court allows [respondent] to withdraw his guilty pleas, enter new pleas, and proceed to trial with the assistance of counsel." *Id.*, at 268.

Whether the competency standard for pleading guilty or waiving the right to counsel is higher than the competency standard for standing trial is a question that has divided the Federal Courts of Appeals[5] and state courts of last re-

---

[5] While the Ninth Circuit and the District of Columbia Circuit, see *United States* v. *Masthers,* 176 U. S. App. D. C. 242, 247, 539 F. 2d 721, 726 (1976), have employed the "reasoned choice" standard for guilty pleas, every other Circuit that has considered the issue has determined that the competency standard for pleading guilty is identical to the competency standard for standing trial. See *Allard* v. *Helgemoe,* 572 F. 2d 1, 3–6 (CA1), cert. denied, 439 U. S. 858 (1978); *United States* v. *Valentino,* 283 F. 2d 634, 635 (CA2 1960) *(per curiam); United States ex rel. McGough* v. *Hewitt,* 528 F. 2d 339, 342, n. 2 (CA3 1975); *Shaw* v. *Martin,* 733 F. 2d 304, 314 (CA4), cert. denied, 469 U. S. 873 (1984); *Malinauskas* v. *United States,* 505 F. 2d 649, 654 (CA5 1974); *United States* v. *Harlan,* 480 F. 2d 515, 517 (CA6), cert. denied, 414 U. S. 1006 (1973); *United States ex rel. Heral* v. *Franzen,* 667 F. 2d 633, 638 (CA7 1981); *White Hawk* v. *Solem,* 693 F. 2d 825, 829–830, n. 7 (CA8 1982), cert. denied, 460 U. S. 1054 (1983); *Wolf* v. *United States,* 430 F. 2d 443, 444 (CA10 1970); *United States* v. *Simmons,* 961 F. 2d 183, 187 (CA11 1992), cert. denied, 507 U. S. 989 (1993). Three of those same Circuits, however, have indicated that the competency standard for waiving the right to counsel is "vaguely higher" than the competency standard for standing trial, see *United States ex rel. Konigsberg* v. *Vincent,* 526 F. 2d 131, 133 (CA2 1975), cert. denied, 426 U. S. 937 (1976); *United States* v. *McDowell,* 814 F. 2d 245, 250 (CA6), cert. denied, 484 U. S. 980 (1987); *Blackmon* v. *Armontrout,* 875 F. 2d 164, 166 (CA8), cert. denied, 493 U. S. 939 (1989), and one of them has stated that the two standards "may not always be coterminous," *United States* v. *Campbell,* 874 F. 2d 838, 846 (CA1 1989). Only the Ninth Circuit applies the "reasoned choice" standard to waivers of counsel, and only the Seventh Circuit, see *United States* v. *Clark,* 943 F. 2d 775, 782 (1991), cert. pending, No. 92-6439, has held that the competency standard for waiving counsel is identical to the competency standard for standing trial. The Fourth Circuit has expressed the view that the two standards are "closely linked." *United States* v. *McGinnis,* 384 F. 2d 875, 877 (1967) *(per curiam),* cert. denied, 390 U. S. 990 (1968).

sort.[6] We granted certiorari to resolve the conflict. 506 U. S. 1033 (1992).

## II

A criminal defendant may not be tried unless he is competent, *Pate* v. *Robinson*, 383 U. S. 375, 378 (1966), and he may not waive his right to counsel or plead guilty unless he does so "competently and intelligently," *Johnson* v. *Zerbst*, 304 U. S. 458, 468 (1938); accord, *Brady* v. *United States*, 397 U. S. 742, 758 (1970). In *Dusky* v. *United States*, 362 U. S. 402 (1960) *(per curiam)*, we held that the standard for competence to stand trial is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding of the proceedings against him." *Ibid.* (internal quotation marks omitted). Accord, *Drope* v. *Missouri*, 420 U. S. 162, 171 (1975) ("[A] person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial"). While we have described the standard for competence to stand trial, however, we have never expressly articulated a standard for competence to plead guilty or to waive the right to the assistance of counsel.

Relying in large part upon our decision in *Westbrook* v. *Arizona*, 384 U. S. 150 (1966) *(per curiam)*, the Ninth Circuit adheres to the view that the competency standard for pleading guilty or waiving the right to counsel is higher than the competency standard for standing trial. See *Sieling* v. *Eyman*, 478 F. 2d 211, 214–215 (1973) (first Ninth Circuit

---

[6] Compare, *e. g.*, *State* v. *Sims*, 118 Ariz. 210, 215, 575 P. 2d 1236, 1241 (1978) (heightened standard for guilty plea); and *Pickens* v. *State*, 96 Wis. 2d 549, 567–568, 292 N. W. 2d 601, 610–611 (1980) (heightened standard for waiver of counsel), with *People* v. *Heral*, 62 Ill. 2d 329, 334, 342 N. E. 2d 34, 37 (1976) (identical standard for pleading guilty and standing trial); and *People* v. *Reason*, 37 N. Y. 2d 351, 353–354, 334 N. E. 2d 572, 574 (1975) (identical standard for waiving counsel and standing trial).

decision applying heightened standard). In *Westbrook*, a two-paragraph *per curiam* opinion, we vacated the lower court's judgment affirming the petitioner's conviction, because there had been "a hearing on the issue of [the petitioner's] competence to stand trial," but "no hearing or inquiry into the issue of his competence to waive his constitutional right to the assistance of counsel." 384 U. S., at 150. The Ninth Circuit has reasoned that the "clear implication" of *Westbrook* is that the *Dusky* formulation is not "a high enough standard" for determining whether a defendant is competent to waive a constitutional right. *Sieling, supra*, at 214.[7] We think the Ninth Circuit has read too much into *Westbrook*, and we think it errs in applying two different competency standards.[8]

### A

The standard adopted by the Ninth Circuit is whether a defendant who seeks to plead guilty or waive counsel has the capacity for "reasoned choice" among the alternatives available to him. How this standard is different from (much less higher than) the *Dusky* standard—whether the defendant has a "rational understanding" of the proceedings—is not readily apparent to us. In fact, respondent himself opposed certiorari on the ground that the difference between the two standards is merely one of "terminology," Brief in Opposition 4, and he devotes little space in his brief on the merits to a defense of the Ninth Circuit's standard, see, *e. g.*, Brief for

---

[7] A criminal defendant waives three constitutional rights when he pleads guilty: the privilege against self-incrimination, the right to a jury trial, and the right to confront one's accusers. *Boykin* v. *Alabama*, 395 U. S. 238, 243 (1969).

[8] Although this case comes to us by way of federal habeas corpus, we do not dispose of it on the ground that the heightened competency standard is a "new rule" for purposes of *Teague* v. *Lane*, 489 U. S. 288 (1989), because petitioner did not raise a *Teague* defense in the lower courts or in his petition for certiorari. See *Parke* v. *Raley*, 506 U. S. 20, 26 (1992); *Collins* v. *Youngblood*, 497 U. S. 37, 41 (1990).

Respondent 17–18, 27, 32; see also Tr. of Oral Arg. 33 ("Due process does not require [a] higher standard, [it] requires a separate inquiry").[9] But even assuming that there is some meaningful distinction between the capacity for "reasoned choice" and a "rational understanding" of the proceedings, we reject the notion that competence to plead guilty or to waive the right to counsel must be measured by a standard that is higher than (or even different from) the *Dusky* standard.

We begin with the guilty plea. A defendant who stands trial is likely to be presented with choices that entail relinquishment of the same rights that are relinquished by a defendant who pleads guilty: He will ordinarily have to decide whether to waive his "privilege against compulsory self-incrimination," *Boykin* v. *Alabama*, 395 U. S. 238, 243 (1969), by taking the witness stand; if the option is available, he may have to decide whether to waive his "right to trial by jury," *ibid.*; and, in consultation with counsel, he may have to decide whether to waive his "right to confront [his] accusers," *ibid.*, by declining to cross-examine witnesses for the prosecution. A defendant who pleads not guilty, moreover, faces still other strategic choices: In consultation with his attorney, he may be called upon to decide, among other things, whether (and how) to put on a defense and whether to raise one or more affirmative defenses. In sum, *all* criminal defendants—not merely those who plead guilty—may be required to make important decisions once criminal proceedings have been initiated. And while the decision to plead guilty is undeniably a profound one, it is no more complicated than the sum total of decisions that a defendant may be called upon to make during the course of a trial. (The decision to plead guilty is also made over a shorter period of

---

[9] We have used the phrase "rational choice" in describing the competence necessary to withdraw a certiorari petition, *Rees* v. *Peyton*, 384 U. S. 312, 314 (1966) *(per curiam)*, but there is no indication in that opinion that the phrase means something different from "rational understanding."

time, without the distraction and burden of a trial.) This being so, we can conceive of no basis for demanding a higher level of competence for those defendants who choose to plead guilty. If the *Dusky* standard is adequate for defendants who plead not guilty, it is necessarily adequate for those who plead guilty.

Nor do we think that a defendant who waives his right to the assistance of counsel must be more competent than a defendant who does not, since there is no reason to believe that the decision to waive counsel requires an appreciably higher level of mental functioning than the decision to waive other constitutional rights. Respondent suggests that a higher competency standard is necessary because a defendant who represents himself " 'must have greater powers of comprehension, judgment, and reason than would be necessary to stand trial with the aid of an attorney.' " Brief for Respondent 26 (quoting Silten & Tullis, Mental Competency in Criminal Proceedings, 28 Hastings L. J. 1053, 1068 (1977)). Accord, Brief for National Association of Criminal Defense Lawyers as *Amicus Curiae* 10–12. But this argument has a flawed premise; the competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right,* not the competence to represent himself.[10] In *Faretta* v. *California,* 422 U. S. 806 (1975), we

---

[10] It is for this reason that the dissent's reliance on *Massey* v. *Moore,* 348 U. S. 105 (1954), is misplaced. When we said in *Massey* that "[o]ne might not be insane in the sense of being incapable of standing trial and yet lack the capacity to stand trial without benefit of counsel," *id.,* at 108, we were answering a question that is quite different from the question presented in this case. Prior to our decision in *Gideon* v. *Wainwright,* 372 U. S. 335 (1963), the appointment of counsel was required only in those state prosecutions in which "special circumstances" were present, see *id.,* at 350–351 (Harlan, J., concurring), and the question in *Massey* was whether a finding that a defendant is competent to stand trial compels a conclusion that there are no "special circumstances" justifying the appointment of counsel. The question here is not whether a defendant who is competent to stand trial has no right to have counsel appointed; it is

held that a defendant choosing self-representation must do so "competently and intelligently," *id.*, at 835, but we made it clear that the defendant's "technical legal knowledge" is "not relevant" to the determination whether he is competent to waive his right to counsel, *id.*, at 836, and we emphasized that although the defendant "may conduct his own defense ultimately to his own detriment, his choice must be honored," *id.*, at 834. Thus, while "[i]t is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts," *ibid.*, a criminal defendant's ability to represent himself has no bearing upon his competence to *choose* self-representation.[11]

B

A finding that a defendant is competent to stand trial, however, is not all that is necessary before he may be permitted to plead guilty or waive his right to counsel. In addition to determining that a defendant who seeks to plead guilty or waive counsel is competent, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary. *Parke* v. *Raley*, 506 U. S. 20, 28–29 (1992) (guilty plea); *Faretta*, *supra*, at 835 (waiver of counsel). In this

whether such a defendant is competent to waive the right to counsel that (after *Gideon*) he under all circumstances has.

[11] We note also that the prohibition against the trial of incompetent defendants dates back at least to the time of Blackstone, see *Medina* v. *California*, 505 U. S. 437, 446 (1992); *Drope* v. *Missouri*, 420 U. S. 162, 171–172 (1975); *Youtsey* v. *United States*, 97 F. 937, 940 (CA6 1899) (collecting "common law authorities"), and that "[b]y the common law of that time, it was not representation by counsel but self-representation that was the practice in prosecutions for serious crime," *Faretta* v. *California*, 422 U. S., at 823; accord, *id.*, at 850 (BLACKMUN, J., dissenting) ("self-representation was common, if not required, in 18th century English and American prosecutions"). It would therefore be "difficult to say that a standard which was designed to determine whether a defendant was capable of defending himself" is "inadequate when he chooses to conduct his own defense." *People* v. *Reason*, 37 N. Y. 2d, at 354, 334 N. E. 2d, at 574.

sense there *is* a "heightened" standard for pleading guilty and for waiving the right to counsel, but it is not a heightened standard of *competence.*[12]

This two-part inquiry[13] is what we had in mind in *Westbrook.* When we distinguished between "competence to stand trial" and "competence to waive [the] constitutional right to the assistance of counsel," 384 U. S., at 150, we were using "competence to waive" as a shorthand for the "intelligent and competent waiver" requirement of *Johnson* v. *Zerbst.* This much is clear from the fact that we quoted that very language from *Zerbst* immediately after noting that the trial court had not determined whether the petitioner was competent to waive his right to counsel. See 384 U. S., at 150 (" 'This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused' ") (quoting *Johnson* v. *Zerbst,* 304 U. S., at 465). Thus, *Westbrook* stands only for the unremarkable proposi-

---

[12] The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the *ability* to understand the proceedings. See *Drope* v. *Missouri, supra,* at 171 (defendant is incompetent if he "lacks the *capacity* to understand the nature and object of the proceedings against him") (emphasis added). The purpose of the "knowing and voluntary" inquiry, by contrast, is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced. See *Faretta* v. *California, supra,* at 835 (defendant waiving counsel must be "made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open' ") (quoting *Adams* v. *United States ex rel. McCann,* 317 U. S. 269, 279 (1942)); *Boykin* v. *Alabama,* 395 U. S., at 244 (defendant pleading guilty must have "a full understanding of what the plea connotes and of its consequence").

[13] We do not mean to suggest, of course, that a court is required to make a competency determination in every case in which a defendant seeks to plead guilty or to waive his right to counsel. As in any criminal case, a competency determination is necessary only when a court has reason to doubt the defendant's competence. See *Drope* v. *Missouri, supra,* at 180–181; *Pate* v. *Robinson,* 383 U. S. 375, 385 (1966).

tion that when a defendant seeks to waive his right to counsel, a determination that he is competent to stand trial is not enough; the waiver must also be intelligent and voluntary before it can be accepted.[14]

## III

Requiring that a criminal defendant be competent has a modest aim: It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel. While psychiatrists and scholars may find it useful to classify the various kinds and degrees of competence, and while States are free to adopt competency standards that are more elaborate than the *Dusky* formulation, the Due Process Clause does not impose these additional requirements. Cf. *Medina* v. *California*, 505 U. S. 437, 446–453 (1992). The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

JUSTICE KENNEDY, with whom JUSTICE SCALIA joins, concurring in part and concurring in the judgment.

I am in full agreement with the Court's decision that the competency standard for pleading guilty and waiving the right to counsel is the same as the test of competency to stand trial. As I have some reservations about one part of the Court's opinion and take a somewhat different path to reach my conclusion, it is appropriate to make some further observations.

The Court compares the types of decisions made by one who goes to trial with the decisions required to plead guilty and waive the right to counsel. This comparison seems to suggest that there may have been a heightened standard of

---

[14] In this case the trial court explicitly found both that respondent was competent and that his waivers were knowing and voluntary. See *supra*, at 392–393.

competency required by the Due Process Clause if the decisions were not equivalent. I have serious doubts about that proposition. In discussing the standard for a criminal defendant's competency to make decisions affecting his case, we should not confuse the content of the standard with the occasions for its application.

We must leave aside in this case any question whether a defendant is absolved of criminal responsibility due to his mental state at the time he committed criminal acts and any later question about whether the defendant has the minimum competence necessary to undergo his sentence. What is at issue here is whether the defendant has sufficient competence to take part in a criminal proceeding and to make the decisions throughout its course. This is not to imply that mental competence is the only aspect of a defendant's state of mind that is relevant during criminal proceedings. Whether the defendant has made a knowing, intelligent, and voluntary decision to make certain fundamental choices during the course of criminal proceedings is another subject of judicial inquiry. That both questions might be implicated at any given point, however, does not mean that the inquiries cease to be discrete. And as it comes to us, this case involves only the standard for determining competency.

This Court set forth the standard for competency to stand trial in *Dusky* v. *United States*, 362 U. S. 402 (1960) *(per curiam)*: "[T]he 'test must be whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.'" *Ibid.* In my view, both the Court of Appeals and respondent read "competency to stand trial" in too narrow a fashion. We have not suggested that the *Dusky* competency standard applies during the course of, but not before, trial. Instead, that standard is applicable from the time of arraignment through the return of a verdict. Although the *Dusky* standard refers to "ability to consult

with [a] lawyer," the crucial component of the inquiry is the defendant's possession of "a reasonable degree of rational understanding." In other words, the focus of the *Dusky* formulation is on a particular level of mental functioning, which the ability to consult counsel helps identify. The possibility that consultation will occur is not required for the standard to serve its purpose. If a defendant elects to stand trial and to take the foolish course of acting as his own counsel, the law does not for that reason require any added degree of competence. See *ante*, at 399–400, n. 10.

The Due Process Clause does not mandate different standards of competency at various stages of or for different decisions made during the criminal proceedings. That was never the rule at common law, and it would take some extraordinary showing of the inadequacy of a single standard of competency for us to require States to employ heightened standards. See *Medina* v. *California*, 505 U. S. 437, 446–447 (1992). Indeed, we should only overturn Nevada's use of a single standard if it " 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' " *Ibid.* (quoting *Patterson* v. *New York*, 432 U. S. 197, 202 (1977)).

The historical treatment of competency that supports Nevada's single standard has its roots in English common law. Writing in the 18th century, Blackstone described the effect of a defendant's incompetence on criminal proceedings:

> "[I]f a man in his sound memory commits a capital offence, and before arraignment for it, he becomes mad, he ought not to be arraigned for it; because he is not able to plead to it with that advice and caution that he ought. And if, after he has pleaded, the prisoner becomes mad, he shall not be tried; for how can he make his defence?" 4 W. Blackstone, Commentaries *24.

Accord, 1 M. Hale, Pleas of the Crown *34–*35.

Blackstone drew no distinction between madness for purposes of pleading and madness for purposes of going to trial. An English case arising in the Crown Court in 1865 indicates that a single standard was applied to assess competency at the time of arraignment, the time of pleading, and throughout the course of trial. See *Regina* v. *Southey,* 4 Fos. & Fin. 864, 872, n. a, 176 Eng. Rep. 825, 828, n. a (N. P. 1865) ("Assuming the prisoner to be insane at the time of arraignment, he cannot be tried *at all,* with or without counsel, for, even assuming that he has appointed counsel at a time when he was sane, it is not fit that he should be tried, as he cannot understand the evidence, nor the proceedings, and so is unable to instruct counsel, or to withdraw his authority if he acts improperly, as a prisoner may always do"); *id.,* at 877, n. a, 176 Eng. Rep., at 831, n. a ("[I]f [the defendant] be so insane as not to understand the nature of the proceedings, he cannot plead").

A number of 19th-century American cases also referred to insanity in a manner that suggested there was a single standard by which competency was to be assessed throughout legal proceedings. See, *e. g., Underwood* v. *People,* 32 Mich. 1, 3 (1875) ("[I]nsanity, when discovered, was held at common law to bar any further steps against a prisoner, at whatever stage of the proceedings"); *Crocker* v. *State,* 60 Wis. 553, 556, 19 N. W. 435, 436 (1884) ("At common law, if a person, after committing a crime, became insane, he was not arraigned during his insanity, but was remitted to prison until such incapacity was removed. The same was true where he became insane after his plea of not guilty and before trial"); *State* v. *Reed,* 41 La. Ann. 581, 582, 7 So. 132 (1889) ("It is elementary that a man cannot plead, or be tried, or convicted, or sentenced, while in a state of insanity"). See also 2 J. Bishop, Commentaries on Law of Criminal Procedure §§ 664, 667 (2d ed. 1872) ("[A] prisoner cannot be tried, sentenced, or punished" unless he is "mentally competent to make a rational defense").

Other American cases describe the standard by which competency is to be measured in a way that supports the idea that a single standard, parallel to that articulated in *Dusky,* is applied no matter at what point during legal proceedings a competency question should arise.   For example, in *Freeman* v. *People,* 4 Denio 2 (N. Y. 1847), it was held: "If . . . a person arraigned for a crime, is capable of understanding the nature and object of the proceedings going on against him; if he rightly comprehends his own condition in reference to such proceedings, and can conduct his defence in a rational manner, he is, for the purpose of being tried, to be deemed sane." *Id.,* at 24–25.   Because the competency question was posed in *Freeman* at the time the defendant was to be arraigned, *id.,* at 19, the *Freeman* court's conception of competency to stand trial was that of a single standard to be applied throughout.

An even more explicit recitation of this common-law principle is found in *Hunt* v. *State,* 27 So. 2d 186 (Ala. 1946).   In the course of the opinion in that case, there was a discussion of the common-law rule regarding a defendant's competency to take part in legal proceedings:

> "The rule at common law . . . is that if at any time while criminal proceedings are pending against a person accused of a crime, the trial court either from observation or upon suggestion of counsel has facts brought to his attention which raise a doubt of the sanity of defendant, the question should be settled before further steps are taken. . . . The broad question to be determined then is whether the defendant is capable of understanding the proceedings and of making his defense, and whether he may have a full, fair and impartial trial." *Id.,* at 191 (citation omitted).

At common law, therefore, no attempt was made to apply different competency standards to different stages of criminal proceedings or to the variety of decisions that a defend-

ant must make during the course of those proceedings. See *Commonwealth* v. *Woelfel*, 88 S. W. 1061, 1062 (Ky. 1905); *Jordan* v. *State*, 135 S. W. 327, 328–329 (Tenn. 1911); *State* v. *Seminary*, 115 So. 370, 371–372 (La. 1927); *State ex rel. Townsend* v. *Bushong*, 146 Ohio St. 271, 272, 65 N. E. 2d 407, 408 (1946) *(per curiam); Moss* v. *Hunter*, 167 F. 2d 683, 684–685 (CA10 1948). Commentators have agreed that the common-law standard of competency to stand trial, which parallels the *Dusky* standard, has been applied throughout criminal proceedings, not just to the formal trial. See H. Weihofen, Mental Disorder as a Criminal Defense 428–429, 431 (1954) ("It has long been the rule of the common law that a person cannot be required to plead to an indictment or be tried for a crime while he is so mentally disordered as to be incapable of making a rational defense"); S. Brakel, J. Parry, and A. Weiner, The Mentally Disabled and the Law 695–696 (3d ed. 1985) ("It has traditionally been presumed that competency to stand trial means competency to partici-pate in all phases of the trial process, including such pretrial activities as deciding how to plead, participating in plea bar-gaining, and deciding whether to assert or waive the right to counsel").

That the common law did not adopt heightened compe-tency standards is readily understood when one considers the difficulties that would be associated with more than one standard. The standard applicable at a given point in a trial could be difficult to ascertain. For instance, if a defendant decides to change his plea to guilty after a trial has com-menced, one court might apply the competency standard for undergoing trial while another court might use the standard for pleading guilty. In addition, the subtle nuances among different standards are likely to be difficult to differentiate, as evidenced by the lack of any clear distinction between a "rational understanding" and a "reasoned choice" in this case. See *ante,* at 398.

It is true, of course, that if a defendant stands trial instead of pleading guilty, there will be more occasions for the trial court to observe the condition of the defendant to determine his mental competence. Trial courts have the obligation of conducting a hearing whenever there is sufficient doubt concerning a defendant's competence. See *Drope* v. *Missouri*, 420 U. S. 162, 180–181 (1975). The standard by which competency is assessed, however, does not change. Respondent's counsel conceded as much during oral argument, making no attempt to defend the contrary position of the Court of Appeals. See, *e. g.*, Tr. of Oral Arg. 22 ("This is not a case of heightened standards"); *id.*, at 31 ("We didn't argue a heightened standard. We did not argue a heightened standard to the Ninth Circuit, nor did we necessarily argue a heightened standard at any juncture in this case"); *id.*, at 33 ("Due process does not require this higher standard, but requires a separate inquiry").

A single standard of competency to be applied throughout criminal proceedings does not offend any " 'principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' " *Medina*, 505 U. S., at 446. Nothing in our case law compels a contrary conclusion, and adoption of a rule setting out varying competency standards for each decision and stage of a criminal proceeding would disrupt the orderly course of trial and, from the standpoint of all parties, prove unworkable both at trial and on appellate review.

I would avoid the difficult comparisons engaged in by the Court. In my view, due process does not preclude Nevada's use of a single competency standard for all aspects of the criminal proceeding. Respondent's decision to plead guilty and his decision to waive counsel were grave choices for him to make, but as the Court demonstrates in Part II–B, there is a heightened standard, albeit not one concerned with competence, that must be met before a defendant is allowed to make those decisions.

With these observations, I concur in the judgment and in Parts I, II–B, and III of the Court's opinion.

JUSTICE BLACKMUN, with whom JUSTICE STEVENS joins, dissenting.

Today, the majority holds that a standard of competence designed to measure a defendant's ability to consult with counsel and to assist in preparing his defense is constitutionally adequate to assess a defendant's competence to waive the right to counsel and represent himself. In so doing, the majority upholds the death sentence for a person whose decision to discharge counsel, plead guilty, and present no defense well may have been the product of medication or mental illness. I believe the majority's analysis is contrary to both common sense and longstanding case law. Therefore, I dissent.

## I

As a preliminary matter, the circumstances under which respondent Richard Allan Moran waived his right to an attorney and pleaded guilty to capital murder bear elaboration. For, although the majority's exposition of the events is accurate, the most significant facts are omitted or relegated to footnotes.

In August 1984, after killing three people and wounding himself in an attempt to commit suicide, Moran was charged in a Nevada state court with three counts of capital murder. He pleaded not guilty to all charges, and the trial court ordered a psychiatric evaluation. At this stage, Moran's competence to represent himself was not at issue.

The two psychiatrists who examined him therefore focused solely upon his capacity to stand trial with the assistance of counsel. Dr. Jack A. Jurasky found Moran to be "in full control of his faculties insofar as his ability to aid counsel, assist in his own defense, recall evidence and to give testimony if called upon to do so." App. 8. Dr. Jurasky, however, did express some reservations, observing: "Psy-

chologically, and perhaps legally speaking, this man, because he is expressing and feeling considerable remorse and guilt, may be inclined to exert less effort towards his own defense." *Ibid.* Nevertheless, under the circumstances, Dr. Jurasky felt that Moran's depressed state of mind was not "necessarily a major consideration." *Ibid.* Dr. William D. O'Gorman also characterized Moran as "very depressed," remarking that he "showed much tearing in talking about the episodes that led up to his present incarceration, particularly in talking about his ex-wife." *Id.,* at 15–16. But Dr. O'Gorman ultimately concluded that Moran "is knowledgeable of the charges being made against him" and "can assist his attorney, in his own defense, if he so desires." *Id.,* at 17.

In November 1984, just three months after his suicide attempt, Moran appeared in court seeking to discharge his public defender, waive his right to counsel, and plead guilty to all three charges of capital murder. When asked to explain the dramatic change in his chosen course of action, Moran responded that he wished to represent himself because he opposed all efforts to mount a defense. His purpose, specifically, was to prevent the presentation of any mitigating evidence on his behalf at the sentencing phase of the proceeding. The trial judge inquired whether Moran was "presently under the influence of any drug or alcohol," and Moran replied: "Just what they give me in, you know, medications." *Id.,* at 33. Despite Moran's affirmative answer, the trial judge failed to question him further regarding the type, dosage, or effect of the "medications" to which he referred. Had the trial judge done so, he would have discovered that Moran was being administered simultaneously four different prescription drugs—phenobarbital, dilantin, inderal, and vistaril. Moran later testified to the numbing effect of these drugs, stating: "I guess I really didn't care about anything . . . . I wasn't very concerned about anything that

was going on . . . as far as the proceedings and everything were going." *Id.*, at 92.[1]

Disregarding the mounting evidence of Moran's disturbed mental state, the trial judge accepted Moran's waiver of counsel and guilty pleas after posing a series of routine questions regarding his understanding of his legal rights and the offenses, to which Moran gave largely monosyllabic answers. In a string of affirmative responses, Moran purported to acknowledge that he knew the import of waiving his constitutional rights, that he understood the charges against him, and that he was, in fact, guilty of those charges. One part of this exchange, however, highlights the mechanical character of Moran's answers to the questions. When the trial judge asked him whether he killed his ex-wife "deliberately, with premeditation and malice aforethought," Moran unexpectedly responded: "No. I didn't do it—I mean, I wasn't looking to kill her, but she ended up dead." *Id.*, at 58. Instead of probing further, the trial judge simply repeated the question, inquiring again whether Moran had acted deliberately. Once again, Moran replied: "I don't know. I mean, I don't know what you mean by deliberately. I mean, I pulled the trigger on purpose, but I didn't plan on doing it; you know what I mean?" *Id.*, at 59. Ignoring the ambiguity of Moran's responses, the trial judge reframed the question to elicit an affirmative answer, stating: "Well, I've previously explained to you what is meant by deliberation and premeditation. Deliberate means that you arrived at or determined as a result of careful thought and weighing the consideration

---

[1] Moran's medical records, read in conjunction with the Physician's Desk Reference (46 ed. 1992), corroborate his testimony concerning the medications he received and their impact upon him. The records show that Moran was administered dilantin, an antiepileptic medication that may cause confusion; inderal, a beta-blocker antiarrhythmic that may cause light-headedness, mental depression, hallucinations, disorientation, and short-term memory loss; and vistaril, a depressant that may cause drowsiness, tremors, and convulsions. App. 97–98.

for and against the proposed action. Did you do that?" This time, Moran responded: "Yes." *Ibid.*

It was only after prodding Moran through the plea collo- quy in this manner that the trial judge concluded that he was competent to stand trial and that he voluntarily and intelligently had waived his right to counsel. Accordingly, Moran was allowed to plead guilty and appear without coun- sel at his sentencing hearing. Moran presented no defense, called no witness, and offered no mitigating evidence on his own behalf. Not surprisingly, he was sentenced to death.

## II

It is axiomatic by now that criminal prosecution of an in- competent defendant offends the Due Process Clause of the Fourteenth Amendment. See *Medina* v. *California,* 505 U. S. 437 (1992); *Riggins* v. *Nevada,* 504 U. S. 127, 138 (1992) (KENNEDY, J., concurring); *Drope* v. *Missouri,* 420 U. S. 162, 171 (1975); *Pate* v. *Robinson,* 383 U. S. 375, 378 (1966). The majority does not deny this principle, nor does it dispute the standard that has been set for competence to stand trial with the assistance of counsel: whether the accused possesses "the capacity to understand the nature and object of the proceed- ings against him, to consult with counsel, and to assist in preparing his defense." *Drope,* 420 U. S., at 171. Accord, *Dusky* v. *United States,* 362 U. S. 402 (1960). My disagree- ment with the majority turns, then, upon another standard— the one for assessing a defendant's competence to waive counsel and represent himself.

The majority "reject[s] the notion that competence to plead guilty or to waive the right to counsel must be meas- ured by a standard that is higher than (or even different from)" the standard for competence to stand trial articulated in *Dusky* and *Drope. Ante,* at 398. But the standard for competence to stand trial is specifically designed to measure a defendant's ability to "consult with counsel" and to "assist in preparing his defense." A finding that a defendant is

competent to stand trial establishes only that he is capable of aiding his attorney in making the critical decisions required at trial or in plea negotiations. The reliability or even relevance of such a finding vanishes when its basic premise—that counsel will be present—ceases to exist. The question is no longer whether the defendant can proceed with an attorney, but whether he can proceed alone and uncounseled. I do not believe we place an excessive burden upon a trial court by requiring it to conduct a specific inquiry into that question at the juncture when a defendant whose competency already has been questioned seeks to waive counsel and represent himself.

The majority concludes that there is no need for such a hearing because a defendant who is found competent to stand trial with the assistance of counsel is, *ipso facto*, competent to discharge counsel and represent himself. But the majority cannot isolate the term "competent" and apply it in a vacuum, divorced from its specific context. A person who is "competent" to play basketball is not thereby "competent" to play the violin. The majority's monolithic approach to competency is true to neither life nor the law. Competency for one purpose does not necessarily translate to competency for another purpose. See Bonnie, The Competence of Criminal Defendants: A Theoretical Reformulation, 10 Behav. Sci. & L. 291, 299 (1992); R. Roesch & S. Golding, Competency to Stand Trial 10–13 (1980). Consistent with this commonsense notion, our cases always have recognized that "a defendant's mental condition may be relevant to more than one legal issue, each governed by distinct rules reflecting quite different policies." *Drope*, 420 U. S., at 176. See *Jackson* v. *Indiana*, 406 U. S. 715, 739 (1972). To this end, this Court has required competency evaluations to be specifically tailored to the context and purpose of a proceeding. See *Rees* v. *Peyton*, 384 U. S. 312, 314 (1966) (directing court "to determine [petitioner's] mental competence in the present posture of things").

In *Massey* v. *Moore,* 348 U. S. 105, 108 (1954), for example, the Court ruled that a defendant who had been found competent to stand trial with the assistance of counsel should have been given a hearing as to his competency to represent himself because "[o]ne might not be insane in the sense of being incapable of standing trial and yet lack the capacity to stand trial without benefit of counsel."[2]   And in *Westbrook* v. *Arizona,* 384 U. S. 150 (1966), the Court reiterated the requirement that the determination of a defendant's competency be tailored to the particular capacity in question, observing: "Although petitioner received a hearing on the issue of his competence to stand trial, there appears to have been no hearing or inquiry into the issue of his competence to waive his constitutional right to the assistance of counsel and proceed, as he did, to conduct his own defense."   See also *Medina,* 505 U. S., at 446–448 (distinguishing between a claim of incompetence and a plea of not guilty by reason of insanity); *Riggins,* 504 U. S., at 140–144 (KENNEDY, J., concurring) (distinguishing between functional competence and competence to stand trial).

Although the Court never has articulated explicitly the standard for determining competency to represent oneself, it has hinted at its contours.   In *Rees* v. *Peyton, supra,* it required an evaluation of competence that was designed to measure the abilities necessary for a defendant to make a decision under analogous circumstances.   In that case, a capital defendant who had filed a petition for certiorari ordered his attorney to withdraw the petition and forgo further legal proceedings.   The petitioner's counsel advised the Court that he could not conscientiously do so without a psychiatric examination of his client because there was some doubt as to

---

[2] The majority's attempt to distinguish *Massey* as a pre-*Gideon* v. *Wainwright,* 372 U. S. 335 (1963), case, *ante,* at 399–400, n. 10, is simply irrelevant.   For, as the majority itself concedes, *Massey* stands only for the proposition that the two inquiries are different—competency to stand trial with the assistance of counsel is not equivalent to competency to proceed alone.

his client's mental competency. Under those circumstances, this Court directed the lower court to conduct an inquiry as to whether the defendant possessed the "capacity to appreciate his position and make a *rational choice* with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." 384 U. S., at 314 (emphasis added). Certainly the competency required for a capital defendant to proceed *without the advice of counsel* at trial or in plea negotiations should be no less than the competency required for a capital defendant to proceed *against the advice of counsel* to withdraw a petition for certiorari. The standard applied by the Ninth Circuit in this case—the "reasoned choice" standard— closely approximates the "rational choice" standard set forth in *Rees.*[3]

Disregarding the plain language of *Westbrook* and *Massey*, the majority in effect overrules those cases *sub silentio.*[4] From the constitutional right of self-representation established in *Faretta* v. *California,* 422 U. S. 806 (1975), the majority extrapolates that "a criminal defendant's ability to represent himself has no bearing upon his competence to *choose*

---

[3] According to the majority, "there is no indication . . . that the phrase ['rational choice'] means something different from 'rational understanding.'" *Ante,* at 398, n. 9. What the majority fails to recognize is that, in the distinction between a defendant who possesses a "rational understanding" of the proceedings and one who is able to make a "rational choice," lies the difference between the capacity for passive and active involvement in the proceedings.

[4] According to the majority, "*Westbrook* stands only for the unremarkable proposition" that a determination of competence to stand trial is not sufficient to waive the right to counsel; "the waiver must also be intelligent and voluntary before it can be accepted." *Ante,* at 401–402. But the majority's attempt to transform a case about the competency to waive counsel into a case about the voluntariness of a waiver needlessly complicates this area of the law. Perhaps competence to waive rights is incorporated into a voluntariness inquiry, but there is no necessary link between the two concepts.

self-representation." *Ante,* at 400. But *Faretta* does not confer upon an *incompetent* defendant a constitutional right to conduct his own defense. Indeed, Faretta himself was "literate, competent, and understanding," and the record showed that "he was voluntarily exercising his informed free will." 422 U. S., at 835. "Although a defendant need not himself have the skill and experience of a lawyer," *Faretta's* right of self-representation is confined to those who are able to choose it "competently and intelligently." *Ibid.* The *Faretta* Court was careful to emphasize that the record must establish that the defendant "'knows what he is doing and his choice is made with eyes open.'" *Ibid.,* quoting *Adams* v. *United States ex rel. McCann,* 317 U. S. 269, 279 (1942).

The majority asserts that "the competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right,* not the competence to represent himself." *Ante,* at 399. But this assertion is simply incorrect. The majority's attempt to extricate the competence to waive the right to counsel from the competence to represent oneself is unavailing, because the former decision necessarily entails the latter. It is obvious that a defendant who waives counsel must represent himself. Even Moran, who pleaded guilty, was required to defend himself during the penalty phase of the proceedings. And a defendant who is utterly incapable of conducting his own defense cannot be considered "competent" to make such a decision, any more than a person who chooses to leap out of a window in the belief that he can fly can be considered "competent" to make such a choice.

The record in this case gives rise to grave doubts regarding respondent Moran's ability to discharge counsel and represent himself. Just a few months after he attempted to commit suicide, Moran essentially volunteered himself for execution: He sought to waive the right to counsel, to plead guilty to capital murder, and to prevent the presentation of any mitigating evidence on his behalf. The psychiatrists' re-

ports supplied one explanation for Moran's self-destructive behavior: his deep depression. And Moran's own testimony suggested another: the fact that he was being administered simultaneously four different prescription medications. It has been recognized that such drugs often possess side effects that may "compromise the right of a medicated criminal defendant to receive a fair trial . . . by rendering him unable or unwilling to assist counsel." *Riggins*, 504 U. S., at 142 (KENNEDY, J., concurring). Moran's plea colloquy only augments the manifold causes for concern by suggesting that his waivers and his assent to the charges against him were not rendered in a truly voluntary and intelligent fashion. Upon this evidence, there can be no doubt that the trial judge should have conducted another competency evaluation to determine Moran's capacity to waive the right to counsel and represent himself, instead of relying upon the psychiatrists' reports that he was able to stand trial with the assistance of counsel.[5]

To try, convict, and punish one so helpless to defend himself contravenes fundamental principles of fairness and impugns the integrity of our criminal justice system. I cannot condone the decision to accept, without further inquiry, the self-destructive "choice" of a person who was so deeply medicated and who might well have been severely mentally ill. I dissent.

---

[5] Whether this same evidence implies that Moran's waiver of counsel and guilty pleas were also involuntary remains to be seen. Cf. *Miller* v. *Fenton*, 474 U. S. 104 (1985) (voluntariness is a mixed question of law and fact entitled to independent federal review).