LUCERO, J.,
concurring in part, dissenting in part.
I join my respected colleagues in all but Part III.B.2 of the majority opinion. Although they adopt the correct legal standard, and aptly note that this is a close matter, I disagree with the majority’s conclusion that the Oklahoma courts reasonably applied federal law in finding that Maynard knowingly, intelligently, and voluntarily waived his right to counsel. On that issue, I respectfully dissent.
A defendant’s decision to waive his right to counsel must not only be competent, but also knowing and voluntary. See Godinez v. Moran, 509 U.S. 389, 400-01 & n. 12, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993). A trial court can assure itself that “an accused’s professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances” of the case. Von Moltke v. Gillies, 332 U.S. 708, 724, 68 S.Ct. 316, 92 L.Ed. 309 (1948). When a defendant has limited mental capacity, as does Maynard,[1] a court may need to take additional steps to ensure the defendant has a “rational as well as factual understanding” of the consequences of his waiver. See Dusky v. United States, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960).
The transcript of the waiver of counsel hearing clearly demonstrates that, despite the court’s repeated attempts at explanation, Maynard did not understand the consequences of his waiver. I excerpt that transcript at some length to show the depth of Maynard’s misapprehension of his rights:
Q. Have you seen your election to proceed pro se that you signed?
A. Yes, I read it, yeah.
Q. Well, why is it that in paragraph three you say you wanted [your appointed counsel] Mr. Standing Bear to stand by and then you tell me today you don’t want him to stand by?
A. Because that’s that mans [sic] conspiracy right there and his conspiracy to get me upset where the jury can see, like I did last time I was over there in Court.
*681 Q. Do you say that [the prosecutor] Mr. Stuart and Mr. Standing Bear are conspiring to upset you in the presence of the jury in order to cause prejudice against you?
A. Yes.
Q. Is that why or one of the reasons why you do not want to have Mr. Standing Bear in the courtroom?
A. That is the reason, one of them.
[Tr. at 13]
Q. Do you intend to testify during the course of this trial yourself?
A. Yeah, I should, you know.
Q. Well, that’s up to you, if the Court allows you to be your own attorney you are going to make these decisions, nobody is going to make them for you. Do you understand the Court—
A. I know I have to give my testimony and nobody—
Q. Do you understand the Court cannot help you in this trial if you proceed pro se?
A. I know that.
[Tr. at 27]
Q. If you choose to testify in this case, Mr. Maynard, and you don’t have an attorney who is going to ask you the questions?
A. I’m just going to-1 ain’t going to take the stand, you know.
Q. You just said that you were, now you’re not?
A. No.
Q. Okay. If you were—
A. Because I know, you know, Mr. Standing Bear has throwed me in total confusion in these courtrooms like the wrong witness list and all that.
Q. Do you understand that you have no duty to testify in a criminal case as a Defendant?
A. Yes.
Q. Do you understand you have every right in the world to do so if that’s your decision or your attorneys [sic] decision if you have one.
A. Yeah.
Q. So if you don’t have an attorney and you wish to testify my question is, who is going to ask you the questions?
A. Well I’m going to have to have him here because I’ve got to take the witness stand.
Q. Now, you have vacillated a little bit, Mr. Maynard. You told me at the outset that you didn’t want him in here. A. Well, I don’t even want him in there, you guys — -hey, I can’t take the witness stand and he’s sabotaging my defense and I’ve got him before the Bar Association right now and him too!
Q. Are you just getting frustrated at this time, Mr. Maynard?
A. Yes, you know, I ain’t going to take the witness stand, let’s proceed on.
Q. Well, this is a simple little hearing compared to the trial—
A. I know, I have been through trials. Q. It might [take] two or three days, do you think you might get frustrated during that time?
A. No.
Q. But you are getting frustrated now? A. Yeah.
Q. Okay, well, you understand that you can either choose to testify or not testify if you are your own attorney.
A. That’s right.
Q. And if you choose to testify and you are your own attorney and Mr. Standing Bear isn’t here to ask you questions you will just have to testify in narrative form, get up and tell a story. Do you understand the pitfalls in doing that Mr. Maynard?
A. Yeah.
*682 [Tr. at 29-30]
Q. Do you wish to have him — now, you told me you don’t want him in the courtroom during this trial and that’s your statement to me.
A. Yeah.
Q. You don’t want him as standby counsel to assist you. Do you want him to assist you in the preparation of jury instructions once this case, all the evidence is presented to the jury?
A. Yeah.
Q. Do you want him—
A. Yeah, I want that.
Q. —in that capacity?
A. Yeah.
Q. All right, do you understand that if you decide to represent yourself do you request that Mr. Standing Bear be totally and wholly discharged from any type of further representation of you either as your advocate or advisor, in other words, that he be unconditionally discharged?
A. Yeah.
Q. You do want him unconditionally discharged?
A. Yeah.
Q. Do you understand the inconsistency with what you just told me that you want him to work on your instructions—
A. Your Honor, I need somebody to help me and he ain’t never helped me do nothing. I mean I can’t get him, I can’t beg him, I don’t care what I do, man, I sent people down there, I can’t get nothing, I have had jailers ask him, I can’t get him over to that jail. I have asked you to get him over there.
Q. Mr. Maynard, do you understand—
A. Why would he come over here and help me when he ain’t helped me in seven months?
Q. Do you understand the inconsistency in one time you told me—
A. Just tell him I don’t want him, period, you know, we’ll just go with the instructions the way it is, you know. I don’t want him around me, man, because he ain’t been around me in seven months.
Q. Well, you have said three different things to the Court now and I don’t know which to accept.
A. No.
Q. No what?
A. I don’t want him in the jury instructions or nothing else because he ain’t seen me in seven months.
Q. You wish to have him totally discharged and you want no assistance from him in any form, is that your statement?
A. Yeah.
Q. Should you determine that and request that Mr. Standing Bear be discharged from representing you in Court would you like for him to assist you in getting your witnesses to Court on time so you can present your defense?
A. I want the witness list that I — not the one that he submitted down here, I want the ones that we argued March the 11th here, nobody wants that witness list brought in here. I want the truth brought out.
Q. Well, we do too, Mr. Maynard. But the question is do you wish for Mr. Standing Bear to assist you in getting the witnesses to the Court when you put on your defense in this case if you represent yourself?
A. Somebody has got to because I—
Q. Well, now, you told me you don’t want him for anything and now you—
*683 A. Well, how am I going to do it over in that jail! Let me out of here on bond, you stuck a hundred and fifty thousand dollar bond on me. Let me get out so I can go get my own witnesses.
Q. That’s the reason I’m asking the question, Mr. Maynard.
A. Yeah, I need somebody. How am I going to do it over in that little cell. Q. Ml right, you want Mr. Standing Bear not to assist you during the trial to the jury. You don’t want him to help you prepare the instructions in this case but you would like to utilize his services—
A. I want to submit his instructions, yeah.
Q. But you would like to utilize the services of Mr. Standing Bear in making arrangements to see that your witnesses are here timely during the trial?
A. Well, how about me submitting that you get them here on time.
Q. Mr. Maynard, I told you the Court cannot help you in this case.
A. Well, you can help me get my witnesses here, the right witnesses too.
Q. No, the Court cannot be an advocate in a jury trial—
A. How am I going to do it over in that jail?
Q. That’s why I’m asking, would you like for Mr.—
A. Yeah, I got to have somebody, him or you or somebody.
Q. Mr. Stuart can’t help you in this case [because] he represents the State, doesn’t he?
A. Well, you guys have thrown me at a total disadvantage because I can’t subpoena witnesses, I give a witness list out and I get the wrong one submitted to the Court.
Q. There is Mr. Standing Bear then that you say at this time you do wish that he not stay in the courtroom to assist you, he not help you with instructions but that he assist you in seeing that witnesses are here—
A. I got to have somebody to get my witnesses.
Q. At your request then.
A. Yes.
Q. Ml right, I understand what you said, I think.
[Tr. at 43-47]
Again and again Maynard displays confusion, seeming to believe alternatively that his attorney is conspiring against him, that he must testify, that he must retain his attorney to question him, that his attorney will help him prepare jury instructions after being unconditionally discharged, and that the court or the prosecutor will assist him.
Based on this record, the panel majority decides that the trial court’s conclusion that Maynard knowingly, intelligently, and voluntarily waived his right to counsel was reasonable. My colleagues advance several bases for their conclusion: the trial court’s repeated attempts to explain the procedural aspects of the trial, the actions of Maynard’s appointed counsel, Maynard’s discussion of his planned defenses,[2] and his expressed desire to proceed pro se. None of these factors, however, bear on *684 whether Maynard actually understood the consequences of his waiver. See Godinez, 509 U.S. at 401 n. 12, 113 S.Ct. 2680 (“The purpose of the ‘knowing and voluntary’ inquiry ... is to determine whether the defendant actually does understand the significance and consequences of a particular decision.”).
Although the standard governing our review of this claim is highly deferential, it is plain that OMahoma allowed a mentally ill ■ man to represent himself. I would hold that this decision was “an unreasonable application of, clearly established Federal law.” 28 U.S.C. § 2254(d)(1).

. Maynard was deemed incompetent to stand trial in a separate case in 1988 and was confined in a state hospital for two years. While under state care he was diagnosed with organic brain syndrome, mild to moderate dementia, and mild mental retardation, having an I.Q. of 59.

. Any fair reading of Maynard's planned defenses only bolsters the conclusion that he was mentally ill. What the majority characterizes as defenses based on insanity, involuntary intoxication, and entrapment are extracted from the following: After the colloquy quoted at length above, Maynard explained to the court that he intended to prove that his previous lawyers conspired with several individuals, including members of the mafia, to have him illegally released from prison, at which time he was drugged against his will and tricked into shooting the victim.
An excerpt from that transcript follows:
Maynard: You see, my defense is different. Mine is this drug deal and conspiracy that *684 they conspired to set me up, you know, they got me released out of jail for the sole purpose of having this Brenda Butler set me up, that is my conspiracy defense.
The Court: Conspiracy among or between whom?
A. [Named individuals] and some mafia guys-
Q., Mafia, what mafia?
Q. Where are the mafia guys?
A. They are up there at Grand Lake.
Q. Oh, one of the Grand Lake mafia boys?
A. Yeah.
Q. What does [the proposed witness] know about this case?
A. Well, she knows that she was slipping chemicals in me for months driving me crazy, you know, and these charges she put on me that was the sole purpose of it.
[Tr. at 64-66]