**STATE ex rel. D.C., Relator,**

v.

**The Honorable Maura McSHANE, Judge, Twenty–First Judicial Circuit, Respondent.**

**No. SC 85555.**

Supreme Court of Missouri, En Banc.

June 8, 2004.

Kristine A. Kerr, Office of State Public Defender, Clayton, for Relator.

Nancy L. Sido, Family Court of St. Louis County, Clayton, for Respondent.

STEPHEN N. LIMBAUGH, JR., Judge.

D.C., who is charged in the juvenile division of the St. Louis County Circuit Court with the commission of several felony offenses, petitions this Court for a writ of prohibition to prevent the court from certifying him to stand trial as an adult. D.C. first sought relief in the Court of Appeals, which was denied. This Court has jurisdiction. Mo. Const. article V, section 4. The preliminary writ of prohibition is made absolute.

## I.

In November 2002, D.C. escaped from the custody of the Division of Youth Services where he had been placed after adjudication for five separate law violations. Following his escape, on November 20, 2002, D.C. and accomplices allegedly committed robbery in the second degree and the class C felony of stealing of a car. Then on December 25, 2002, D.C., again with accomplices, allegedly committed first-degree robbery and first-degree assault. Since that time, D.C. has been confined in the St. Louis family court detention center. On December 26, 2002, the St. Louis County juvenile office filed a petition against D.C. pursuant to section 211.071, RSMo 2000—the statute that allows a juvenile court to dismiss a case so that it may be brought in a court of general jurisdiction—on the basis that D.C. had "committed two or more prior unrelated offenses which would be felonies if committed by an adult. . . ." In other words, the juvenile office moved that D.C. be certified for transfer to an adult court.

After the juvenile division set the date for the certification hearing, D.C.'s counsel, knowing that D.C. had a history of moderate mental retardation, hired a psychologist, Dr. Jefferies Caul, to evaluate D.C.'s competency to proceed. Thereafter, the juvenile officer requested that Dr. Margo Layton, a staff psychologist for the St. Louis family court, also evaluate D.C. on the competency issue. Dr. Layton had previously performed a psychological evaluation on D.C., though it was unrelated to his competency to stand trial. She and Dr. Caul also relied on evaluations conducted in 2001 and 2002 by another psychologist, Dr. Russo.

On July 17, 2003, following the doctors' evaluations, the juvenile division held a competency hearing. D.C. called both Dr. Caul and Dr. Layton as witnesses, and their testimony was to the same effect. Both doctors testified that D.C. was moderately retarded and that the he had a full scale IQ of 46. They explained that the least serious category of mental retardation is mild mental retardation and that 80–85% of the mentally retarded population falls into this category. On the other hand, moderate mental retardation, from which D.C. suffers, is the next level of retardation, and individuals with this condition constitute only 10% of the retarded population. They added that moderately

retarded individuals acquire their communication skills during an early age and are unlikely to progress beyond the second grade level. In their adult years, these individuals function best in highly structured group homes and usually work in a sheltered-workshop setting.

Dr. Caul conducted a variety of tests to gauge D.C.'s mental abilities. He found that D.C.'s language was "simple, immature and concrete for his age." In conversation, D.C. had "word finding difficulties" and "errors of verb tense." His skills were "uniformly depressed." D.C. also had trouble understanding basic concepts from everyday experience. He identified the shape of a ball as a square, stated that Monday followed directly after Saturday, and said that there were twelve weeks in a year. When shown a picture of a spoon, "D.C. insisted on calling it a fork." On the Peabody Picture Vocabulary Test, which asks the subject to perform tasks such as picking out a picture of a cow from three other pictures, D.C. performed at the age equivalent of below one year and nine months. In a similar type of test, the Expressive Vocabulary Test, D.C. misidentified an elephant as a "lion" and a rabbit as a "cat." D.C.'s age equivalent on this test was "two years and six months." Dr. Caul also found D.C.'s short-term memory skills were extremely limited. For example, he could not repeat a three-digit number, such as "five, eight, two." He also failed to repeat "six, eight, nine." Dr. Caul determined that D.C.'s short-term memory was at a "three-year-old level." In addition, Dr. Caul tested D.C.'s "visual-perceptual-motor processing skills" by asking D.C. to replicate a drawing directly below the original. On that test, D.C. was "able to do some items up to about a five-year-old level, but at a five year level, he started refusing to do them because it was too challenging for him." The results of Dr. Caul's testing of D.C.'s academic skills were much the same. D.C. was only able to read a few isolated words, such as "in, can, as, was, have, when, and about." Dr. Caul found that D.C. did not consistently know his letters and that he was unable to identify the "letter b or the letter c," and he explained that "these skills should be emerging in the preschool level." Further, although D.C. did his best to comply with testing directions, he could only understand some of them. For example, D.C. could not read the phrase "one book" and point to the picture of the book.

Dr. Caul then testified about D.C.'s understanding of the certification hearing and its participants. D.C. explained that a lawyer's job was to "Help you. Try to get you out of here." The judge's role was to "send you away." The deputy juvenile officer's purpose was to "try to help change your life." However, when Dr. Caul asked D.C. about the difference between right and wrong, D.C. said he "didn't know." Furthermore, Dr. Caul found that D.C.'s ability to communicate his own thoughts was at a two-year six-month level, and his short-term memory skills were so limited that "he is not able to follow any complex interactions at all, especially in a legal setting." Ultimately, Dr. Caul concluded that D.C. was not competent to participate in the certification hearing.

Dr. Layton's tests yielded similar results. For example, she found that D.C.'s ability to acquire and retain verbal information in an academic setting was lower than "99% of his age level peers." Dr. Layton found that D.C.'s arithmetic and vocabulary skills were "very significantly below average." On a test to determine D.C.'s ability to process information acquired from everyday experience, D.C. scored a "one" the "lowest scalable score." On the "block design" test, D.C. received a scale of four, which is equivalent to a

chronological age of ten and one-half years, but this was the best D.C. performed on in any of the tests. In sum, Dr. Layton stated that D.C. is one of the "five or less" most delayed individuals she has tested in her twenty-five years of practice working for the St. Louis County court system, a practice in which she presumably treated many scores of troubled youths.

Dr. Layton also testified about D.C.'s understanding of the certification process. She noted that D.C. was able to express that the purpose of the hearing was to determine in which court the case was to be heard. D.C. also understood that "he would have a record for life if he were sent to the adult court and that he could start over if he were retained in the juvenile system." In addition, D.C. told Dr. Layton that he did not want to be certified; instead, he wanted to stay in the juvenile system and "get his life back together." In view of these responses, Dr. Layton surmised that while D.C. understands what a certification hearing is to the extent that he understands that he may or may not be retained in the juvenile system, he may be unable to weigh and evaluate the long-term impact of the decisions that could be made at the certification hearing.

Unlike Dr. Caul, Dr. Layton did not reach a conclusion about D.C.'s competency to proceed in a certification hearing, because she believed that it was a decision for the court. However, she maintained that it would be difficult for D.C. to completely follow the certification hearing and that he had a compromised ability to work collaboratively with his attorney and make informed decisions about the case. If the vocabulary used in the courtroom was above a "second or third grade level," then D.C. might not understand it. All in all, Dr. Layton had significant questions about D.C.'s capacity to fully participate in the juvenile proceedings. Finally, she explained that she had been trained to detect malingering, and she did not believe D.C. was malingering.

The juvenile office's sole witness was deputy juvenile officer Helena O'Reilly. She testified that D.C. had written ten love letters to girls while in the custody of the juvenile division, that she had seen the letters through interoffice mail, and that D.C. told her that he had written them. Though Ms. O'Reilly did not actually see D.C. write any of the love letters, she testified that all of these letters were written in the same handwriting, but she did note that some of the handwriting was in print and some was "more cursive." Ms. O'Reilly also acknowledged that another explanation for the letters "is that he had a friend help him . . . ."

Ms. O'Reilly then testified about a grievance form that D.C. had purportedly filled out, which was in the same handwriting as the love letters. This form was admitted into evidence and contained D.C.'s name, unit, unit leader's name, date, his juvenile officer's name, and the shift in which the incident occurred. The author wrote in the blank designated for a description of the incident, "I ask for another bottle of deodorant. Because the other kind he gave us burns everybody under the arms. So he drop my level." The form also posed the question, "Why do you feel you are being treated unfairly?" to which the author responded, "That was stupid to drop my level because I ask for deodorant." Ms. O'Reilly testified that the handwriting on the form was identical to the love letters, but, as it was with the love letters, she did not actually see D.C. fill out the form.

When confronted with this evidence, Dr. Caul agreed that the handwriting could be D.C.'s, but both he and Dr. Layton opined that the information contained on the form

was totally inconsistent with their evaluations of D.C. In addition, Dr. Layton testified that there were only three possibilities regarding the authorship of the grievance form: 1) D.C. had written it and had been malingering for three separate psychological professionals since at least 2001; 2) that someone else had written it for D.C.; and 3) D.C. had been coached. Dr. Layton then reiterated that she thought that her test results were "accurately reflecting his intellectual ability ..." and that D.C. was not malingering.

On July 21, 2003, the juvenile division issued an order that D.C. was competent to proceed with a certification hearing. In support of the order, the court noted: "During the hearing the Court heard the evidence and had the opportunity to observe the juvenile. At one point during the hearing juvenile's attorney showed him a document and had a conversation with the juvenile regarding the document." The court ultimately found that "although the juvenile may be in the moderately retarded range; he is competent to understand the certification hearing and to consult with his attorney." As a result, the court set the matter for a certification hearing that is now the subject of the writ.

## II.

■ As an initial matter, respondent argues that D.C.'s petition for writ of prohibition should be dismissed pursuant to Rule 84.22(a), because adequate relief can be afforded by an appeal. "Prohibition will lie when there is an important question of law decided erroneously that would otherwise escape review by this Court, and the aggrieved party may suffer considerable hardship and expense as a consequence of the erroneous decision." *State ex rel. Chassaing v. Mummert*, 887 S.W.2d 573, 577 (Mo. banc 1994). Here, respondent's argument is based on *In re T.J.H.*, 479 S.W.2d 433 (Mo. banc 1972), in which this Court held that an interlocutory appeal was not available to review an order transferring a juvenile to the adult court system. *Id.* at 434–35. The remedy, this Court held, was that the juvenile could file a motion to dismiss in the circuit court. *Id.* at 435. In this case, however, the petition is to preclude the judge from conducting the certification hearing in the first place. Because the certification hearing has not occurred, *T.J.H.* is inapplicable, and because the determination of competency for the purposes of a certification hearing is not a final order subject to review, prohibition is an appropriate remedy.

## III.

■ On the merits, D.C. argues that he is entitled to a writ of prohibition preventing the juvenile division from finding him competent to proceed, because he cannot understand or appreciate the nature of the proceedings or assist his counsel. The Supreme Court has not expounded on a competency requirement for juvenile certification proceedings, and to date has held only that the proceedings are "critically important" and "must satisfy the basic requirements of due process and fairness...." *Kent v. United States*, 383 U.S. 541, 553, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966). These requirements include, at the least, a hearing, assistance of counsel, and a statement of reasons for the court's decision. *Id.* at 561. In any event, the juvenile office here submits that the competency standard is the same as that in the adult context, that is, the accused must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and a "rational as well as factual understanding of the proceedings against him," citing *Godinez v. Moran*, 509 U.S. 389, 390, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993) (plead guilty

or waive counsel); *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (criminal trial).

Applying this standard to the facts of the case leads to the conclusion that D.C. is not competent and that the trial court's determination to the contrary is not supported by the record. There is no need to recount all of the factual details. Suffice it to say that according to the uncontroverted testimony of both experts, D.C. is suffering from severe mental limitations, and he is not functioning much above an early elementary school level. Further, he understands the workings of the legal system and the certification procedures only on a vague and superficial level and would not be able to adequately consult with counsel. And, significantly, neither of the experts detected any evidence of malingering that would have allowed the trial court to discount their findings. Although Ms. O'Reilly's account of the love letters and grievance form plays against a finding of incompetency, the fact remains that she did not see D.C. write any of the documents, and she conceded that D.C. may have been assisted. Ultimately, however, this Court is most persuaded by the testimony of the juvenile court's own expert, Dr. Layton, who not only refuted Ms. O'Reilly's testimony about the letters, but joined in Dr. Caul's bleak and seemingly hopeless evaluations in all material respects. Though developmental delay does not necessarily equate to incompetence, it is compelling evidence indeed that D.C. is one of the "five most delayed individuals" that Dr. Layton has treated in her twenty-five years of practice. In short, the evidence of incompetence was overwhelming.

### IV.

In conclusion, this Court holds that D.C. is incompetent to proceed with the certification hearing. The preliminary writ is made absolute.

All concur.