IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 26, 2021 Session

**STATE OF TENNESSEE v. EMILY LEANNE BROOKS**

**Appeal from the Criminal Court for Hamilton County**
**No. 303669     Don W. Poole, Judge**

---

**No. E2020-01563-CCA-R3-CD**

---

The Defendant, Emily Leanne Brooks, entered an open guilty plea to second degree murder. Prior to sentencing, she obtained new counsel and filed a motion to withdraw her plea one week after it was entered. That motion, along with her subsequent motion to reconsider, was denied following the trial court's balancing analysis of the factors set forth in State v. Phelps, 329 S.W.3d 436, 446 (Tenn. 2010), and its determination that the Defendant was not a credible witness. The Defendant was, thereafter, sentenced to twenty-one years. She appeals as of right, noting that she immediately sought to withdraw her plea and arguing (1) that the significance of her traumatic brain injury on her decision-making process was underappreciated by her prior attorneys and the trial court, and (2) that given her difficulties, she should have been allowed to speak with her parents who were present in the courtroom before being required to accept the take-it-or-leave plea deal that was presented that day. Following our review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and JILL BARTEE AYERS, JJ., joined.

Charles Leland Davis, Janie Parks Varnell, and Logan Davis (on motion to withdraw and on appeal), Chattanooga, Tennessee; and Steven E. Smith, District Public Defender, and Boyd Patterson and Steve Brown, Assistant District Public Defenders (at guilty plea hearing), for the appellant, Emily Leanne Brooks.

Herbert H. Slatery III, Attorney General and Reporter; Cody N. Brandon, Assistant Attorney General; Neal Pinkston, District Attorney General; and Crystle Carrion, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

On December 13, 2017, the Hamilton County Grand Jury charged the Defendant with the first-degree premeditated murder of Eric Burchfield ("the victim") after the Defendant allegedly shot the victim in the back of the head at a local Chattanooga gas station on July 21, 2017. See Tenn. Code Ann. § 39-13-202. Thereafter, on January 23, 2020, the Defendant agreed to enter an open plea as a Range I, standard offender, to second degree murder with a sentencing range of fifteen to twenty-five years. See Tenn. Code Ann. §§ 39-13-210, 40-35-112(a)(1). The Defendant completed a written petition acknowledging the consequences of her plea and waiving her rights.

At the January 23, 2020 guilty plea hearing, the State provided a detailed recitation of the facts underlying the offense. According to the State, an eyewitness stated that while on her way inside the gas station store, she saw a white female standing near the vehicle by which the victim was found lying, that the female had shoulder-length hair with blonde highlights, that the female was on the phone "ranting about a boyfriend and drugs," and that when the witness came out of the convenience store, the female was gone. When officers went to the victim's mother's house to inform her of the victim's death, the victim's mother indicated that the Defendant had shot the victim and that when the victim's mother provided a description of the Defendant, it closely matched the description given by the gas station eyewitness. The victim's cell phone was examined, and it displayed text messages reflecting that the Defendant and the victim were at odds. Officers went to the Defendant's residence, and when the Defendant arrived, she was arrested. Officers observed that the Defendant appeared to have new freshly-cut, freshly-dyed hair in an "attempt to change her appearance." The Defendant attempted to escape her handcuffs and flee on foot but was captured a short distance away. While attempting to flee, the Defendant tried to retrieve something from her backpack. Officers found a handgun in the backpack that was subsequently determined to match the .380 casing found near the victim's body at the gas station. The Defendant's lawyers were asked if they had anything to add, and they replied in the negative.

It was noted that the parents of the victim and the Defendant were both present in the courtroom for the guilty plea and that they had both been frequently present for court proceedings. The trial court first instructed the twenty-eight-year-old Defendant about the seriousness of pleading guilty and the importance of answering its questions truthfully. The trial court told the Defendant that failure to answer its questions truthfully could result in a perjury charge, and the Defendant indicated that she understood the concept of perjury. The trial court requested of the Defendant that she ask her attorneys or the trial court if she did not understand something, and the Defendant responded affirmatively.

The Defendant affirmed that she had read and reviewed the plea agreement paperwork and that she had discussed it "completely" with her lawyers. When asked if she had any questions about the paperwork, the Defendant replied in the negative. The trial court reminded the Defendant to tell the trial court if she had any questions. The Defendant then confirmed that she had signed the petition to enter a guilty plea, that she had initialed each paragraph, and that she had read and discussed each paragraph with her attorneys. She affirmed that she understood the document.

The Defendant informed the trial court that she had finished part of her senior year of high school and obtained her General Educational Development diploma ("G.E.D."). She also confirmed that she had pleaded guilty in other cases and understood her rights on those occasions. The Defendant confirmed that she had received a copy of the indictment and discussed it "completely" with her attorneys. She understood that she was charged with first-degree murder and the life imprisonment punishment she was facing if she proceeded to trial. She further understood that her plea would result in a conviction that would be on her criminal record and could later be used against her. She acknowledged that as a result of her conviction, she would lose the rights to vote and own a firearm. The Defendant's rights were then explained to her, including her right to a jury trial, to have counsel at that trial, to the presumption of innocence, to call and confront witnesses against her, to select a jury, to testify in her own defense, and to appeal any jury conviction. The Defendant stated that she understood those rights and that by entering a guilty plea, she was waiving all those rights, though she would still have a sentencing hearing.

The Defendant indicated that she had no questions, that she "completely" understood what she was doing by pleading guilty, and that she had no reason to believe her reasoning was impaired. The Defendant stated that she had been in custody for thirty-one months prior to entry of her plea. She affirmed that she was not impaired by alcohol or drugs, that she had taken her prescription medication that day, and that her medication did not impede her decision-making ability. She agreed that she was pleading guilty freely and voluntarily and that no one had forced or coerced her to do so. She confirmed that she had not been promised any specific sentence and knew that her plea would result in a sentence of anywhere between fifteen to twenty-five years, which would be determined by the trial court at a later sentencing hearing. She affirmed that she was satisfied with her attorneys' representation. The trial court once again asked the Defendant if she had any question before accepting her plea, to which she replied in the negative. The trial court thereafter determined that the Defendant was entering her plea freely and voluntarily and accepted the plea.

The next day after the guilty plea hearing, the Defendant phoned her mother from jail, and the two women discussed the circumstances that took place at the plea hearing. That conversation was recorded. In the recording, the Defendant asked her mother if it

"was a good idea" for her to plead guilty, and her mother expressed that she was unsure. The Defendant's mother said that she wished it would have raised "a red flag" for the Defendant when the Defendant's lawyers informed the Defendant that she could not speak with her parents because "they [were] not on board with" the plea.

The Defendant and her mother discussed their dissatisfaction with the Defendant's attorneys and their belief that the lawyers did not have the Defendant's best interest at heart. The Defendant asserted that she was "flying solely" on her lawyers' opinions when she decided to plead and remarked that she did not "know how this stuff work[ed]." The Defendant expressed that she could not fight the case and her lawyers too, though she affirmed that she had been adamant with her lawyers that she was not accepting the twenty-year plea agreement that had been offered to her previously. According to the Defendant, her lawyers had not done anything she wanted them to do but instead did whatever they wanted.

The Defendant's mother said that "trial was the leverage" and claimed that the Defendant's lawyers did not explain to her and the Defendant's father what an open plea entailed and that the Defendant was waiving her appeal rights. According to the Defendant's mother, the Defendant's lawyers said to her that the Defendant was a grown adult who could make her own decisions. She indicated that her request to speak with the Defendant was denied. The Defendant's mother expressed that she was still "trying to make sense of" what happened in the courtroom; that it was possible the Defendant could get a lesser sentence at the sentencing hearing, though she was uncertain; and that the process was confusing to her and the Defendant's father.

The Defendant affirmed that she could "make [her] own decisions," but she observed that she was "stuck relying on two people" who did not care about her. The Defendant said that she had only had a few months to think about the twenty-year plea offer and that she was unfamiliar with her "choices and options." The Defendant further indicated that her fellow inmates were telling her not to proceed to trial.

According to the Defendant, her lawyers told her on the day of the guilty plea hearing that she had "to sign right then." The Defendant's mother replied that the lawyers "just took away [the Defendant's] rights" and "her leverage" to possibly get a lower offer of seventeen or eighteen years. Her mother then stated that they would explore the Defendant's options.

After the Defendant hired new counsel, she filed a motion to withdraw her guilty plea on January 30, 2020, one week following her guilty plea. In the motion, the Defendant alleged that she felt pressured to enter her guilty plea, that she was not afforded an opportunity to discuss the plea with her parents, that the effects of a 2011 traumatic brain injury impaired her decision-making ability, and that she "did not understand the full

impact of an open guilty plea nor the limitations placed upon her to any subsequent appeal of her sentence." Affidavits from the Defendant and both of the Defendant's parents were attached to the motion. According to the affidavits, the Defendant believed she was in court on January 23, 2020, to set a trial date; the Defendant wished to proceed to trial; the Defendant was not allowed to speak with her parents prior to entering the plea despite mutual requests to do so; the Defendant suffered a serious brain injury following a car accident that made it difficult for her to make decisions under pressure; the Defendant took required medication for her brain injury and "mental condition"; the Defendant felt pressured to plead guilty; the Defendant did not "completely understand" the consequences of an open plea; and the Defendant wished to withdraw her plea. A hearing was held on the motion to withdraw on June 4, 2020.

At the motion to withdraw hearing, the Defendant testified that prior to coming to court on January 23, 2020, she had been offered a twenty-year plea deal "on multiple other occasions" and that she expected to be setting a trial date in court that day because she did not intend to accept that offer. The Defendant indicated that she "was terrified in making this decision and . . . was just having a really hard time." Sometime later in the day, the Defendant's lawyers approached her with the open plea deal to second degree murder, which she "was ignorant of up until that point." She said that she asked to speak with her parents about the new offer prior to accepting it but that her attorneys denied her that opportunity. She felt "slightly manipulated" and forced to make a decision on the agreement "within a couple of hours." She believed that it was "important for [her] to have been given all of [her] options and choices," and she thought that she was going to be given time to decide whether to accept the open plea but was not. She stated that she initially felt like she "was offered the open plea bargain as a way out, . . . as kind of a saving grace," but that she "was kind of left in the dark with a lot of it." The Defendant said that she was unaware that she would be required to accept it that day or that she would not be able to appeal the final decision. When the Defendant returned to jail after entering her plea, she called her parents, and within a day or two, they decided to look for a new lawyer and try to withdraw the plea, all believing that the plea was not in her best interest.

The Defendant testified that she was in a car wreck in 2011 that rendered her unconscious, caused her brain to swell, required numerous surgeries, and left her in the hospital for about a month. She felt that the injury affected her ability to make decisions. She explained that she did not tell the judge about her desire to go to trial because she did not have "enough knowledge." She persisted in her desire to withdraw her guilty plea despite the possibility of a jury convicting her of first-degree murder.

On cross-examination, the Defendant acknowledged that she had been in custody for this crime for over two years prior to entry of her guilty plea. The Defendant confirmed that she had completed the eleventh grade, had obtained her G.E.D., and could read and

- 5 -

write.  The Defendant agreed that she had previously pled guilty to nine other offenses and had "some familiarity" with what it meant to have a criminal charge and to plead guilty to a criminal offense.  Copies of her convictions were entered as an exhibit, reflecting misdemeanor convictions for a violation of boat rules and regulations, possession of a controlled substance, disorderly conduct, failure to appear, evading arrest, criminal trespassing, and three thefts.

The Defendant testified that she did not remember signing the plea agreement paperwork in this case, but she acknowledged that the petition bore her signature, initials, and identifying information.  She recalled "in general" the decision to plead guilty but did not remember most of the details surrounding that decision.  She reaffirmed that she "was unaware that there was no appeal on the open plea decision," though she initialed the portion of the plea agreement explaining to her that she was waiving her right to appeal her conviction and sentence except to the extent allowed by Tennessee Rule of Procedure 37(b)(2).  When asked about her understanding of the questions presently being asked of her, she said that she was "pretty sure" she understood "everything" that was happening at the motion to withdraw hearing, explaining that her lawyer had prepared her for the proceeding.

The Defendant stated that she had no trouble hearing the trial court at the plea hearing and that she understood the questions she was being asked "for the most part."  However, she claimed that she did not know what perjury meant despite indicating she understood perjury at the plea hearing.  The Defendant explained that even if she had indicated at the plea hearing that she understood the consequences of her plea, the fact that her right to appeal would be circumscribed by a plea "let[ her] know that [she] did not understand what [she] thought [she] understood at the time."

In rendering its ruling, the trial court first recalled some of the procedural history of the Defendant's case, noting that the Defendant did have a forensic evaluation prior to proceeding with trial and that the defense filed a motion to suppress, which was denied after a "rather lengthy hearing."[1]  The trial court also noted that the original trial date of November 12, 2019, was "canceled on motion of the defense."

The trial court then observed that pursuant to Tennessee Rule of Criminal Procedure 32, the proper standard for reviewing the Defendant's motion was to allow withdrawal for "any fair and just reason."  The trial court referenced the factors outlined by the Tennessee

---

[1] On June 7, 2019, the Defendant filed a motion to suppress, arguing that her arrest was not supported by a reasonable suspicion of criminal activity and that, therefore, all evidence discovered as a result of that arrest should be suppressed.

Supreme Court in State v. Phelps, 329 S.W.3d 436, 446 (Tenn. 2010), and utilized those factors in deciding the Defendant's motion to withdraw.

Addressing those various factors,[2] the trial court found that the short delay between the guilty plea hearing and the request to withdraw the plea clearly favored the Defendant. The trial court found that the explanation for that delay was a neutral factor since the delay was so short. The trial court also found that the Defendant had never asserted or maintained her innocence, noting that it did not find the Defendant very credible in regards to her not remembering the details of the plea paperwork and hearing, both of which were lengthy in the trial court's opinion. The trial court further noted that the guilty plea hearing included a recitation of the facts underlying the offense and repeated inquiry of the Defendant relative to whether she understood what was taking place. The trial court also referenced the recording of the jail call between the Defendant and her mother as evidence that the Defendant never asserted or maintained her innocence. Ultimately, it counted that factor "very much against" the Defendant. With respect to the circumstances of the plea, the trial court found it important that the Defendant had previously lost an involved motion to suppress incriminating evidence and that this was not the Defendant's first trial date. The trial court also counted that factor "very much against" the Defendant. As for the Defendant's nature and background, the trial court did not believe that the Defendant's injury from the car wreck in 2011 had any significant impact on the Defendant's ability to understand the plea agreement. The trial court remarked that the Defendant appeared to be "very intelligent, very street smart," so it counted the factor "at least, against" her. In addition, the trial court indicated that the Defendant's "extensive" experience with the criminal justice system, including her nine previous guilty pleas, weighed against setting aside the plea.

In addition to these factors, the trial court observed that the Defendant's recorded conversation with her mother was "very revealing" of the Defendant's intent to work the system, noting that they discussed using the plea as leverage, the possibility of "doing better," and that if they insisted upon a trial, "maybe things [would] get better." The trial court found that this conversation indicated that both the Defendant and her mother "were very street smart" as to what took place in criminal proceedings. Ultimately, the trial court weighed the conversation "very much against" the Defendant.

The trial court observed that though a change of heart might sometimes warrant the withdrawal of guilty plea, it did not find that the various factors weighed in the Defendant's favor. The trial court indicated that the Defendant's complaint about lack of access to her parents was unpersuasive because the case had been pending for over two years and the Defendant had been able to speak with her parents on many prior occasions, including

_____

[2] These factors will be discussed at length in the analysis section of this opinion. For the sake of brevity, we choose not to restate them in their entirety here.

reviewing the twenty-year deal that had been offered, and she was not a teenager dependent on their guidance. The trial court again did not find the Defendant's statements regarding her lack of memory of the circumstances surrounding the plea to be credible and concluded that the Defendant was not entitled to withdraw her plea.

Thereafter, the Defendant filed a motion to reconsider the denial of her motion to withdraw, arguing that (1) the Defendant's request to withdraw her plea and proceed to trial was an assertion of innocence entitling her to withdrawal; (2) the Defendant's strategic discussions with her mother after her plea should not have been held against her, and her mother's statements regarding "leverage" should not be imputed to her; (3) the trial court did not appropriately account for the effect of the Defendant's brain injury on her decision-making ability; (4) the Defendant should have been allowed to speak with her parents after being presented with a plea offer that required immediate acceptance or for the Defendant to likely spend the rest of her life in prison; and (5) her criminal history consisted of misdemeanor charges in general sessions court and did not adequately equate with the severity and the consequences of pleading guilty to second degree murder in criminal court. A hearing was held on the motion to reconsider.

At the motion to reconsider hearing, the Defendant's attorney indicated that he had spoken with one of the Defendant's previous attorneys, an assistant public defender, who corroborated that the Defendant was first offered the open plea on January 23, 2020. The Defendant also entered as an exhibit a thirty-four-page medical document, which according to the Defendant's attorney, indicated that the Defendant suffered from "increased impulsivity [and] decreased memory" due to "a traumatic brain injury" following the car wreck in 2011. The Defendant's attorney further indicated that the document was in the public defender's file at the time the Defendant entered the plea, indicating that the Defendant's prior attorneys were aware of her deficits, though the lawyers did not allow the Defendant to speak with her parents about the take-it-or-leave-it plea deal.

Relative to the brain injury from the car wreck, the State responded that there was nothing in the medical document that reflected the Defendant suffered from "an ongoing issue in her decision-making nine years later." The State also indicated that relying on the Defendant's attorney's paraphrasing an out-of-court conversation with one of the Defendant's prior attorneys was improper. Finally, the State averred that the assistant public defenders were the ones who approached the State with the open plea offer and that it was not the other way around, as the Defendant's new attorney now suggested.

The trial court thereafter denied the motion to reconsider. The trial court noted that the Defendant's prior lawyers received notice of the 2011 automobile accident and that in

- 8 -

response, they asked for a psychiatric evaluation to be performed.[3] According to the trial court, the Defendant "was found to be competent at the time of the act and competent to stand trial." The trial court further indicated that it had reviewed the thirty-four-page record from Erlanger Hospital, which reflected (1) that the Defendant was in a serious automobile accident in November 2011 where she suffered "a closed-head injury, apparently a fracture," (2) that she was hospitalized for an extended period of time, and (3) that most of the injuries and hospitalization were the result of facial fractures.

The trial court again found that the plea was "voluntarily, understandingly, intelligently, and appropriately made," that the Defendant was "not emotional at all" during the guilty plea hearing, and that she appeared to understand the entire process. The trial court further noted that the Defendant "was a willing participant in all of that discussion about leverage and so forth, . . . that she knew completely what was going on and . . . never asserted anything about innocence at the time, [and that] it was more maybe for leverage or to get a better deal or something like that." Regarding the Defendant's nature and background, the trial court noted that shortly after the shooting, the Defendant "showed up in a car with her hair cut and her coloring changed," which indicated her ability to be purposeful and calculating. The trial court noted that although the Defendant's criminal record consisted of misdemeanors only, she entered a guilty plea on nine different occasions providing her with "a lot of experience in the criminal justice system." The trial court again concluded that there was no fair and just reason to allow the Defendant to withdraw her plea.

In its written order that followed, the trial court again reaffirmed its prior findings and denied the Defendant's motion to reconsider her request to withdraw her guilty plea. The trial court observed that "there was nothing about the records from 2011 that would indicate that the [D]efendant had a difficult time making decisions" and that "the [D]efendant had never indicated actual innocence based upon her voluntary, understanding and intelligent entry of the guilty plea itself and by the jailhouse call between herself and mother." The trial court cited to State v. Terry L. Brazzell, No. M2016-00603-CA-R3-CD, 2016 WL 6803894 (Tenn. Crim. App. Nov. 17, 2016), in support of its decision to deny her motion to reconsider and request to withdraw her plea.

Following a sentencing hearing, the trial court entered judgments on November 17, 2020, reflecting the Defendant's conviction for second degree murder and twenty-one-year sentence. The Defendant filed a timely notice of appeal.

---

[3] The record reflects that in April 2018, the trial court entered an Order Directing Forensic Evaluation by the Community Mental Health Center Under Tennessee Code Annotated section 33-7-301(a), instructing that the Defendant was to be evaluated regarding her competency to stand trial, her mental condition at the time of crime, and whether she suffered from diminished capacity.

ANALYSIS

On appeal, the Defendant asserts that the trial court should have allowed her to withdraw her plea after a proper consideration of the Phelps factors. Specifically, she notes that she immediately sought to withdraw her plea and submits that the significance of her traumatic brain injury on her decision-making process was underappreciated by her prior attorneys and the trial court, and that given her difficulties, she should have been allowed to speak with her parents who were present in the courtroom before being required to accept the take-it-or-leave plea deal that was presented that day. The State responds that the trial court appropriately exercised its discretion balancing the evidence in denying the Defendant's request to withdraw her guilty plea, noting that only one Phelps factor favored withdrawal and that the trial court found that the Defendant's motion was little more than a tactical tool for negotiation.

A trial court's decision regarding a defendant's motion to withdraw a plea is reviewed for an abuse of discretion. Phelps, 329 S.W.3d at 443 (citing State v. Crowe, 168 S.W.3d 731, 740 (Tenn. 2005)). "An abuse of discretion exists if the record lacks substantial evidence to support the trial court's conclusion." Crowe, 168 S.W.3d at 740 (citing Goosby v. State, 917 S.W.2d 700, 705 (Tenn. Crim. App. 1995)). A trial court also abuses its discretion "when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, . . . applies reasoning that causes an injustice to the complaining party[, or] . . . fail[s] to consider the relevant factors provided by higher courts as guidance for determining an issue." Phelps, 329 S.W.3d at 443 (internal citations omitted).

A defendant who has entered a guilty plea does not have a right to unilaterally withdraw the plea. Phelps, 329 S.W.3d at 444. However, Tennessee Rule of Criminal Procedure 32(f)(1) provides that "[b]efore sentence is imposed, the court may grant a motion to withdraw a guilty plea for any fair and just reason." The Tennessee Supreme Court has concluded that in the absence of a definition of "fair and just" in the Rules of Criminal Procedure, trial courts should use "the federal courts' non-exclusive multi-factor approach" in determining whether to permit a defendant to withdraw a plea. Id. at 447. Those factors include:

> (1) the amount of time that elapsed between the plea and the motion to withdraw it; (2) the presence (or absence) of a valid reason for the failure to move for withdrawal earlier in the proceedings; (3) whether the defendant has asserted or maintained his innocence; (4) the circumstances underlying the entry of the guilty plea; (5) the defendant's nature and background; (6) the degree to which the defendant has had prior experience with the criminal

justice system; (7) potential prejudice to the government if the motion to withdraw is granted.

Id. at 446 (quoting United States v. Haygood, 549 F.3d 1049, 1052 (6th Cir. 2008)). "[N]o single factor is dispositive," and "the relevance of each factor varies according to the circumstances surrounding both the plea and the motion to withdraw." Id. (citing Haygood, 549 F.3d at 1052). The list of factors is not exclusive, and "a trial court need not consider the seventh factor unless and until the defendant establishes a fair and just reason for permitting withdrawal." Id. at 446-47 (citing United States v. Ellis, 470 F.3d 275, 286 (6th Cir. 2006)). A defendant bears the burden of establishing grounds for withdrawing his or her plea. Id. at 444.

"[T]he purpose of the 'any fair and just reason' standard 'is to allow a hastily entered plea made with unsure heart and confused mind to be undone.'" Phelps, 329 S.W.3d at 448 (quoting United States v. Alexander, 948 F.2d 1002, 1004 (6th Cir. 1991)). This standard reflects that "[b]efore sentencing, the inconvenience to court and prosecution resulting from a change of plea is ordinarily slight as compared with the public interest in protecting the right of the accused to trial by jury." Crowe, 168 S.W.3d at 741 (quoting Kadwell v. United States, 315 F.2d 667, 670 (9th Cir. 1963)). Thus, where the balance of the factors weighs in the defendant's favor, the trial court should permit a defendant to withdraw a plea "even if the defendant's reasons could be characterized as a 'change of heart.'" Phelps, 329 S.W.3d at 448. "[T]he trial judge should always exercise his discretion with caution in refusing to set aside a plea of guilty, to the end that one accused of crime may have a fair and impartial trial." Id. at 443 (quoting Henning v. State, 201 S.W.2d 669, 671 (Tenn. 1947)). However, "a defendant should not be allowed to pervert this process into a tactical tool for purposes of delay or other improper purpose." Id. at 448.

In this case, the trial court engaged in the relevant analysis, weighed the factors against each other and the other evidence presented to the trial court, and determined the balance was against allowing the Defendant to withdraw her plea. Therefore, we will review that decision for an abuse of discretion.

The trial court found that the first Phelps factor—the amount of time that elapsed between the plea and the motion to withdraw it—"clearly" favored the Defendant because the motion was filed a week after the plea was entered. During the one-week time period after entry of the Defendant's plea, she procured new counsel to file her motion to withdraw.

The Defendant argues that the trial court failed to give this factor its proper import because within twenty-four hours of her plea, after the first opportunity to speak with her parents, the Defendant decided to withdraw the plea. According to the Defendant, this is

significant proof that she did not understand the consequences of her plea and provided "proof of the internal turmoil she faced when forced to enter a plea without speaking to her parents and under pressure." The State does not dispute that this factor clearly favored the Defendant, and we agree with the State and the trial court. However, to accept the Defendant's argument would place this factor above all others and render the additional Phelps factors meaningless, which cannot be what our supreme court intended.

The second factor looks to the presence or absence of a valid reason for the delay in filing the motion. The trial court determined that this factor was neutral because there was no real delay given that the motion was filed so quickly.

The State asks that we agree with the trial court. However, the Defendant asserts that this factor significantly weighs in her favor "because she immediately expressed her clear desire to withdraw her guilty plea," which indicated that "she did not understand the consequences of her plea." We agree with the trial court and the State that this factor is neutral because there was no delay for the Defendant to explain. This factor focuses on the reason provided for the delay rather than the underlying reasons for filing the motion, and no considerable delay was present here. The Defendant's argument would again have us place the expediency of the Defendant's filing her motion above all other Phelps factors.

The third factor addresses the Defendant's assertion or maintaining of innocence. The trial court determined that the factor weighed "very much against" the Defendant, finding the Defendant not credible. The trial court did not accredit the Defendant's testimony that she failed to recollect most of the details of the plea paperwork and hearing because both of them were lengthy in the trial court's opinion and because the guilty plea hearing included a recitation of the facts of the offense and repeated inquiry of the Defendant whether she understood what was taking place. The trial court also referenced the recording of the jail call between the Defendant and her mother as evidence that the Defendant never asserted or maintained her innocence.

The Defendant contends the trial court misapplied this factor because "[t]here is no clearer evidence of an assertion of actual innocence" than filing a motion to withdraw her plea and expressing a desire to proceed to trial. She also submits that her strategic discussions with her mother after her plea should not be held against her and that her mother's statements regarding "leverage" should not be imputed to her. However, we agree with the State that the Defendant cannot claim that this factor weighs in her favor simply because she filed a motion to withdraw her plea. To adopt the Defendant's reasoning would eliminate the utility of this factor and allow every defendant to claim this benefit simply by filing a motion to withdraw. Cf. State v. Jamie Todd Birdwell, No. M2017-01620-CCA-R3-CD, 2019 WL 5847289, at *6 (Tenn. Crim. App. Nov. 7, 2019) (holding that the trial court did not abuse its discretion by finding that the third factor

weighed against the defendant who only asserted his innocence when he sought to withdraw his pleas).

Furthermore, nowhere in the record does the Defendant affirmatively assert her innocence. At the guilty plea hearing, the State gave a detailed recitation of the facts, and the Defendant was thoroughly questioned about her understanding before pleading guilty and never indicated that she was not guilty or entering only a best interest plea. There is certainly no assertion in the phone call between the Defendant and her mother while they were talking about the events that took place at the guilty plea hearing that a travesty had occurred because the Defendant was innocent, but rather they discussed what to do merely in terms of strategy or "leverage." Based upon the phone call, the Defendant and her mother appear to be concerned with whether the Defendant could have received a better plea offer. Following the motion to reconsider, the trial court determined that the Defendant "was a willing participant in all of that discussion about leverage and so forth, . . . that she knew completely what was going on and . . . never asserted anything about innocence at the time, [and that] it was more maybe for leverage or to get a better deal or something like that." In its written order, the trial court found that "the [D]efendant had never indicated actual innocence based upon her voluntary, understanding and intelligent entry of the guilty plea itself and by the jailhouse call between herself and mother." We agree. Cf. State v. Mitchell Nathaniel Scott, No. M2013-01169-CC-R3-CD, 2014 WL 1669964, at *6 (Tenn. Crim. App. Apr. 25, 2014) (holding that simply because the defendant entered into a best interest plea did not establish that he had asserted or maintained his innocence) (citation omitted).

Moreover, the Defendant never asserted her innocence during her testimony at the motion to withdraw hearing, stating only that she was unaware by pleading guilty she was waiving her right to appeal the final decision and wished to proceed to trial. The Defendant was specifically advised at the guilty plea hearing that she was waiving her right to appeal her conviction, though she would still have a sentencing hearing, and she indicated her agreement. We cannot say that the trial court abused its discretion by weighing this factor heavily against the Defendant.

The fourth and fifth factors address the circumstances underlying the guilty plea and the Defendant's nature and background. The trial court counted the fourth factor relative to the circumstances of the plea "very much against" the Defendant, noting that the Defendant had previously lost an involved motion to suppress incriminating evidence and that this was not the Defendant's first trial date. As for the Defendant's nature and background, the trial court did not believe that the Defendant's injury from the car wreck in 2011 had any significant impact on the Defendant's ability to understand the plea agreement. The trial court remarked that the Defendant appeared to be "very intelligent, very street smart," so it counted the factor "at least, against" her.

Following the motion to reconsider, the trial court noted that the Defendant's prior lawyers had received notice of the 2011 automobile accident, that they had asked for a psychiatric evaluation to be performed, and that the Defendant "was found to be competent at the time of the act and competent to stand trial." The trial court also stated that it had reviewed the thirty-four-page hospital record that the Defendant had provided. In its written order, the trial court observed that "there was nothing about the records from 2011 that would indicate that the [D]efendant had a difficult time making decisions." The trial court also indicated that the Defendant's complaints about lack of access to her parents were unpersuasive because the case had been pending for over two years and the Defendant had been able to speak with her parents on many prior occasions, including reviewing the twenty-year deal that had been offered. The trial court further noted that she was not a teenager dependent on their guidance. The trial court did not find the Defendant's statements regarding her lack of memory of the circumstances surrounding the plea to be credible. The trial court found that the plea was "voluntarily, understandingly, intelligently, and appropriately made," that the Defendant was "not emotional at all" during the guilty plea hearing, and that she appeared to understand the entire process. Regarding the Defendant's nature and background, the trial court noted that shortly after the shooting, the Defendant "showed up in a car with her hair cut and her coloring changed," which indicated her ability to be purposeful and calculating.

The Defendant submits that the trial court failed to account for any of the arguments or testimony raised by her during the motion to withdraw proceedings with regard to the circumstances underlying her guilty plea. The Defendant contends that she "offered substantial proof about how rushed she felt in making this decision," noting that she went to court on January 23, 2020, to pick a trial date, that she presented uncontested medical records of her preexisting traumatic brain injury, and that she was not permitted to talk with her parents before accepting the take-it-or-leave it plea. The State responds that the trial court properly weighed these factors against the Defendant.

We once again agree with the State and the trial court. The trial court thoroughly reviewed the plea colloquy; the procedural history of the case, which included a mental evaluation; and the Defendant's allegations regarding her traumatic injury, as well as the medical document she submitted. The twenty-eight-year-old Defendant completed the eleventh grade and later obtained her G.E.D. She had been in custody for over two years at the time she entered her plea and had plenty of time to review a repeated offer of a twenty-year sentence to second degree murder. She reviewed and signed a detailed petition informing her of the consequences of her plea and the rights she was waiving. The transcript of the guilty plea hearing reflected that the Defendant was fully aware of the plea process and the consequences of entering a guilty plea. The trial court repeatedly ensured that the Defendant understood the process and consequences of pleading guilty and had discussed the agreement fully with her attorneys.

Although the Defendant claimed that her history of a traumatic brain injury prevented her from understanding the plea process, she presented insufficient evidence to substantiate her claim. Though the medical document she submitted indicated that she suffered a traumatic brain injury in 2011, it did not confirm her claim that the car accident nine years earlier than the hearing hindered her decision-making ability or compromised her ability to understand her guilty plea in 2020, after consultation with her attorneys and extensive questioning by the trial court. See Brazzell, 2016 WL 6803894, at *5 (finding that though the defendant claimed his history of mental illness prevented his understanding the plea process, he presented no evidence to substantiate his claim, so his nature and background weighed against permitting him to withdraw his plea). She also failed to present any evidence of what medications she was taking for her "medical condition." At the guilty plea hearing, she indicated that these medications did not impair her decision-making process. In addition, the trial court found her claims of forgetfulness incredible.

Following a mental evaluation, the Defendant had been found competent at the time of the act and competent to stand trial. The standard is the same for determining the competency of the accused to plead guilty. See Godinez v. Moran, 509 U.S. 389, 399 (1993); State v. Berndt, 733 S.W.2d 119, 123 (Tenn. Crim. App. 1987). For all of these reasons, we cannot say the trial court abused its discretion by weighing these two factors against the Defendant.

The sixth factor addresses the degree of experience the Defendant has with the court system. The trial court indicated that the Defendant's "extensive" experience with the criminal justice system, including her nine previous guilty pleas to misdemeanors, weighed against setting aside the plea. The Defendant argues that the trial court erred because the Defendant's criminal history consisted of misdemeanor charges in general sessions court and did not adequately equate with the severity and the consequences of pleading guilty to second degree murder in criminal court. At the guilty plea hearing, the Defendant informed the trial court that she had pleaded guilty in other cases and understood her rights on those occasions. At the motion to withdraw hearing, the Defendant agreed that she had previously pled guilty to nine other offenses and had "some familiarity" with what it meant to have a criminal charge and to plead guilty to a criminal offense. The Defendant, by her own admission, was experienced with the criminal justice system. We agree with the trial court and the State that the Defendant was aware of the plea process and the consequences of entering a guilty plea because she had done so nine times before despite the fact that the prior convictions were only for misdemeanors. See Brazzell, 2016 WL 6803894, at *5.

We observe that only one of the first six Phelps factors favored the Defendant—that being the expediency with which she obtained new counsel and filed her motion to withdraw her guilty plea. In Phelps, the court held that the potential prejudice to the prosecution factor only becomes relevant when the record shows that "at least some of the

- 15 -

factors" indicate that there may be a "fair and just reason" to allowing the withdrawal of the guilty plea prior to sentencing. See 329 S.W.3d at 451. Relative to potential prejudice to the State, the trial court made no findings in this regard. Neither party makes any argument regarding this factor on appeal. There has never been any specific allegation from the State that any of its proof is now spoiled or unavailable in this case. It would appear that the evidence against the Defendant remains within the State's possession and available for a trial. See State v. Rodney Alan Kiefner, No. W2017-02096-CCA-R3-CD, 2018 WL 5920502, at *10 (Tenn. Crim. App. Nov. 9, 2018). Therefore, just as in Phelps, this factor would be neutral, not favoring either party. See id.

Furthermore, in addition to the non-exclusive Phelps factors, the trial court observed that the Defendant's recorded conversation with her mother was "very revealing" of the Defendant's intent to work the system, noting that they discussed using the plea as leverage, the possibility of "doing better," and that if they insisted upon a trial, "maybe things [would] get better." The trial court found that this conversation indicated that both the Defendant and her mother "were very street smart" as to what took place in criminal proceedings. The trial court observed that though a change of heart might sometimes warrant the withdrawal of guilty plea, it did not find that the various factors weighed in the Defendant's favor. The trial court's ruling indicates its belief that the Defendant was seeking to withdraw her plea merely to gain a tactical advantage. See Phelps, 329 S.W.3d at 448. Following our review of the recording, we reject the Defendant's claim that the trial court erred by placing this conversation between the Defendant and her mother in such a context.

We conclude that the trial court properly considered the Phelps factors and found that the Defendant did not provide sufficient justification of a fair and just reason for the withdrawal of her plea. The seventh factor is neutral. We agree with the trial court that the balance of the factors did not weigh in favor of the Defendant. The trial court did not abuse its discretion by denying the Defendant's request to withdraw her guilty plea, and she is not entitled to relief.

CONCLUSION

After consideration of the Phelps factors, we conclude that the trial court did not abuse its discretion by denying the Defendant's request to withdraw her plea. The judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE