*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

UNPUBLISHED
September 12, 2024

*In re* J. L. MATHEWS, JR., Minor.

No. 370060
Berrien Circuit Court
Family Division
LC No. 2023-000033-NA

Before: N. P. HOOD, P.J., and O'BRIEN and REDFORD, JJ.

PER CURIAM.

Respondent appeals by right the order terminating his parental rights to his minor child, JM, under MCL 712A.19b(3)(i) (prior termination of parental rights due to physical abuse; failure to rectify conditions that led to prior termination), (j) (reasonable likelihood of harm if returned to parent), and (k)(*iii*) (battering or severe physical abuse of child or sibling; reasonable likelihood of harm if returned to parent). On appeal, respondent argues that the trial court clearly erred by assuming jurisdiction over JM under MCL 712A.2(b)(1) (failure to provide proper care or custody) and (2) (unfit home or environment). Respondent also argues that the trial court clearly erred by finding that termination served JM's best interests under MCL 712A.19b(5). Because the trial court did not clearly err by assuming jurisdiction over JM or finding that termination served his best interests, we affirm.

## I. BACKGROUND

This case concerns the termination of respondent's parental rights to JM. In April 2023, JM's mother[1] gave birth to him. In May 2023, the Department of Health and Human Services (DHHS) petitioned the trial court to assume jurisdiction over JM and terminate respondent's parental rights. DHHS alleged that respondent physically abused JM's older sibling, causing severe head trauma and other injuries indicative of strangulation. DHHS claimed that respondent's

---

[1] JM's mother is not a party to this case.

-1-

actions led to the 2012 termination of his parental rights to JM's older sibling. DHHS also alleged that respondent was previously diagnosed with bipolar disorder and schizophrenia.

A referee held the preliminary hearing, during which respondent waived the probable-cause determination. The trial court then authorized the petition, released JM to his mother, and allowed respondent to have supervised visitation with JM. The same referee conducted the combined adjudicatory hearing and dispositional hearing.

During the adjudicatory hearing, DHHS specialist Megan Chartrand testified that respondent physically abused JM's older sibling when she was an infant, causing severe head trauma. At that time, DHHS developed a case service plan but respondent did not participate in the offered services. In 2012, a court terminated respondent's parental rights to JM's older sibling. DHHS later received notice of JM's birth. Chartrand investigated respondent and discovered that he had multiple convictions for domestic-violence-related charges. She also discovered that respondent was diagnosed with schizophrenia. Respondent maintained that he had bipolar disorder, not schizophrenia. He denied taking medication for either condition.

Psychiatrist Dr. Lucien Tamer testified that he treated respondent between July 2022 and June 2023. Tamer diagnosed respondent with schizophrenia, depression, and post-traumatic stress disorder (PTSD). Tamer explained that respondent was hospitalized on two occasions for exhibiting symptoms of psychosis. He was most recently hospitalized in August 2023, during which he exhibited symptoms including striking his head, pulling out his hair, and responding to internal stimuli. For these reasons, Tamer expressed reservations about respondent's ability to adequately care for a child.

Respondent testified that he did not physically abuse JM's older sibling. He was not aware that a court terminated his parental rights to JM's older sibling, and he had little knowledge of those termination proceedings. Respondent acknowledged that he had depression and PTSD but denied having schizophrenia. Respondent also acknowledged that he was serving a prison sentence of 12 to 120 months, which was later revealed to be attributed to possession of methamphetamine. Respondent was willing to complete a case service plan and wished to reunify with JM.

Pediatrician Bethany Mohr testified that she treated JM's older sibling in 2012. JM's older sibling had scratches on her neck, a depressed skull fracture, brain bleeds, and hemorrhages. Mohr was not given any explanation regarding the cause of her injuries and opined that they likely resulted from physical abuse. Mohr stated that the injuries could have been fatal if she had not received medical treatment.

Following the adjudicative portion of the hearing, the referee assumed jurisdiction over JM under MCL 712A.2(b)(1) and (2). He reasoned that respondent physically abused JM's older sibling, had serious mental health conditions, had difficulty controlling his emotions, had not acted to rectify these conditions, was incarcerated, and had additional pending charges. The referee acknowledged that respondent was found incompetent to stand trial for his most recent criminal

charges but concluded that the finding had no bearing on the court's ability to assume jurisdiction over JM or terminate respondent's parental rights.[2]

During the dispositional phase of the hearing, DHHS caseworker Jaquaya Williams testified that prior to his incarceration, respondent completed parenting classes, underwent a psychological evaluation and medication review, and participated in counseling. Respondent engaged in supervised visitation with JM but repeatedly displayed poor parenting skills including falling asleep with JM and needing instruction to care for him. Williams opined that respondent did not benefit from parenting time or appear interested in caring for JM. Williams visited respondent in jail until he accused her of breaking into his apartment and threatened to sue her. During a brief period in which respondent was released from jail, he had unauthorized contact with JM and his mother. Respondent repeatedly contacted JM's mother although she did not wish to speak to him. Considering his conduct, Williams opined that respondent failed to rectify the barriers to reunification.

JM's mother testified that she had concerns about respondent's ability to care for JM because he resisted medication, lashed out, wrote her threatening letters, and made threatening phone calls to her. She opined that the trial court should terminate respondent's parental rights.

Upon conclusion of the dispositional portion of the hearing, the referee found grounds to terminate respondent's parental rights under MCL 712A.19b(3)(i), (j), and (k)(*iii*). The referee also found that termination served JM's best interests. The trial court adopted the referee's recommendations. This appeal followed.

## II. JURISDICTION

Respondent argues that the trial court clearly erred by assuming jurisdiction over JM under MCL 712A.2(b)(1) and (2). We agree only in part.

_____

[2] Respondent has not challenged the trial court's assumption of jurisdiction or termination of parental rights on the basis of his competency to stand trial. In the criminal context, a defendant must be competent to stand trial. *Godinez v Moran*, 509 US 389, 396; 113 S Ct 2680; 125 L Ed 2d 321 (1993). Defendants are presumed to be competent. *People v Abraham*, 256 Mich App 265, 283; 662 NW2d 836 (2003). Thus, when a defendant does not raise the issue of his competency before the trial court, the trial court has no duty to *sua sponte* order a competency hearing unless facts are brought to the trial court's attention which raise a "bona fide doubt" as to the defendant's competence. *People v Harris*, 185 Mich App 100, 102; 460 NW2d 239 (1990) (quotation marks and citation omitted). In termination proceedings, this Court applies the standards used to evaluate competency in criminal proceedings. See, e.g., *In re Farrell*, unpublished per curiam opinion of the Court of Appeals, issued February 26, 2015 (Docket No. 322834), p 3. Therefore, although we question the referee's conclusion that respondent's lack of competency to stand trial for his most recent criminal charges has *no* bearing on the court's ability to assume jurisdiction over JM or terminate respondent's parental rights, we need not address respondent's competency to stand trial in these proceedings.

To properly exercise jurisdiction in a child protective proceeding, the trial court must find by a preponderance of the evidence that a statutory basis for jurisdiction exists. *In re BZ*, 264 Mich App 286, 295; 690 NW2d 505 (2004). We review "the trial court's decision to exercise jurisdiction for clear error in light of the court's findings of fact." *Id*. "A finding is clearly erroneous if, although there is evidence to support it, we are left with a definite and firm conviction that a mistake has been made." *In re HRC*, 286 Mich App 444, 459; 781 NW2d 105 (2009) (quotation marks and citation omitted).

Child protective proceedings consist of two distinct phases: the adjudicative phase and the dispositional phase. *In re Utrera*, 281 Mich App 1, 15; 761 NW2d 253 (2008). "During the adjudicative phase, which occurs first, the trial court determines whether it may exercise jurisdiction over the minor child pursuant to MCL 712A.2(b)." *Id*. at 15-16 (citation omitted). "If the court acquires jurisdiction over the child, the dispositional phase follows, at which the trial court determines what action, if any, will be taken on behalf of the child." *Id*. at 16 (citations omitted).

Here, the trial court found by a preponderance of the evidence that there were statutory bases to assume jurisdiction over JM under MCL 712A.2(b)(1) and (2). MCL 712A.2(b)(1) provides that a trial court may exercise jurisdiction over a child

> [w]hose parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship.

MCL 712A.2(b)(2) provides that a trial court may exercise jurisdiction over a child "[w]hose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian, is an unfit place for the juvenile to live in."

Respondent argues that the trial court erred by assuming jurisdiction under both MCL 712A.2(b)(1) and (2) because, at the time the petition was filed, JM was living with his mother, and no evidence was presented to suggest that her home was unfit for JM. When DHHS filed the petition, JM was residing with his mother in a different home than respondent. This living situation was the result of a safety plan implemented by Children's Protective Services (CPS). DHHS did not allege that the home was unfit place JM, which the trial court must find before assuming jurisdiction under MCL 712A.2(b)(2). Accordingly, the trial court clearly erred by assuming jurisdiction over JM under MCL 712A.2(b)(2).

Nonetheless, the trial court properly assumed jurisdiction under MCL 712A.2(b)(1). MCL 712A.2(b)(1) permits a trial court to assume jurisdiction over a child even if they are not living with the respondent. In assuming jurisdiction under MCL 712A.2(b)(1), the trial court noted that respondent failed to provide, when able to do so, support, education, medical, surgical, or other necessary care for health or morals, and that respondent presented a substantial risk of harm to JM's mental well-being. The trial court considered respondent's (1) criminal history, (2) previous CPS case, and (3) mental health conditions.

Regarding respondent's criminal history, the trial court discussed respondent's past convictions, which included multiple assaultive offenses and domestic-violence convictions. Respondent's criminal history was relevant to the issue of his ability to provide support for JM and the risk of harm that he presented to JM's well-being. Therefore, the trial court properly considered respondent's criminal history.

The trial court also acknowledged that the termination order from the previous case indicated that JM's older sibling suffered abusive head trauma at the hands of respondent. "A child may come within the jurisdiction of the court solely on the basis of a parent's treatment of another child." *In re Gazella*, 264 Mich App 668, 680; 692 NW2d 708 (2005). This is because "[t]he doctrine of anticipatory neglect recognizes that how a parent treats one child is certainly probative of how that parent may treat other children." *In re Kellogg*, 331 Mich App 249, 259; 952 NW2d 544 (2020) (quotation marks and citation omitted). "Abuse or neglect of the second child is not a prerequisite for jurisdiction of that child and application of the doctrine of anticipatory neglect." *In re Gazella*, 264 Mich App at 680-681. Although the trial court did not specifically note that it was employing the doctrine of anticipatory neglect, it was nevertheless acceptable for the trial court to consider respondent's treatment of JM's older sibling when determining whether jurisdiction in the instant case was proper. Given the severe abuse that JM's older sibling suffered, the trial court correctly considered the potential physical and mental harm that JM could suffer if he was returned to respondent's care.

Lastly, as to respondent's mental health conditions, the trial court noted that he continuously denied his schizophrenia diagnosis and was not consistently compliant with medication, which could lead to aggressive outbursts like those that previously occurred. The record supports this conclusion, including testimony from respondent's psychiatrist indicating that, when not properly treated, schizophrenia patients can suffer from symptoms including paranoia, delusions, disorganized thinking, inability to maintain a job, relationship difficulty, decreased self-care, and aggression. Respondent's assaultive history, coupled with his refusal to recognize and properly treat his schizophrenia, implicated JM's mental and physical well-being while in respondent's care.

In light of this evidence, the trial court did not clearly err by assuming jurisdiction over JM under MCL 712A.2(b)(1).

## II. BEST INTERESTS

Respondent also argues that the trial court clearly erred by finding that termination served JM's best interests under MCL 712A.19b(5).[3] We disagree.

"Best interests are determined on the basis of the preponderance of the evidence." *In re LaFrance*, 306 Mich App 713, 733; 858 NW2d 143 (2014). This Court reviews the trial court's determination of best interests for clear error. *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d

---

[3] Respondent does not challenge the statutory grounds for termination. Nevertheless, the record supports the trial court's conclusion that statutory grounds for termination existed under MCL 712A.19b(3)(i), (j), and (k)(*iii*).

-5-

144 (2012). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re BZ*, 264 Mich App at 296-297. "Appellate courts are obliged to defer to a trial court's factual findings at termination proceedings if those findings do not constitute clear error." *In re Rood*, 483 Mich 73, 90; 763 NW2d 587 (2009).

"Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts*, 297 Mich App at 40, citing MCL 712A.19b(5). When considering best interests, the focus is on the child rather than the parent. *In re Moss*, 301 Mich App 76, 87; 836 NW2d 182 (2013). "The trial court should weigh all the evidence available to determine the child's best interests." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). The trial court may consider such factors as "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts*, 297 Mich App at 41-42 (citations omitted). Other factors the trial court may consider include the "parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App at 714.

In determining that termination was in JM's best interests, the trial court noted that an order granting JM's mother sole custody would be insufficient to provide the stability and finality that JM needed. Additionally, the trial court determined that, on the basis of the evidence presented, it was unlikely that respondent could ever provide proper care and custody for JM. Although some evidence was presented that there was a parent-child bond between respondent and JM, the remaining factors weigh in favor of termination. At the termination hearing, witness testimony indicated that respondent failed to accept and properly address his schizophrenia diagnosis. Respondent's psychiatrist testified that, without proper treatment, schizophrenia patients present with symptoms that can negatively impact their ability to parent, including paranoia, delusions, disorganized thinking, inability to maintain a job, relationship difficulty, decreased self-care, and aggression. Respondent's psychiatrist also expressed concerns about respondent's ability to parent the child because, during his last hospital admission, which occurred in August 2023, respondent displayed symptoms including striking his head, pulling his hair out, and responding to internal stimuli.

Respondent also had a criminal history that included several assaultive offenses, including domestic-violence convictions that he continued to deny. Further, a caseworker testified that respondent failed to exhibit benefit from his case service plan, including that, although he completed the recommended parenting class, he still lacked overall parenting abilities. The caseworker explained that respondent fell asleep during parenting time, became frustrated with JM when he was crying, and needed frequent direction to meet JM's basic needs. This, coupled with respondent's mental health conditions and aggressive tendencies, provided sufficient evidence to support the trial court's determination that termination was in JM's best interests.

We affirm.

/s/ Noah P. Hood
/s/ Colleen A. O'Brien
/s/ James Robert Redford